Peter FILIPPI et al.

v.

Marion FILIPPI et al.

v.

Peter Filippi et al.

v.

Citizens Trust Company, in its capacity
as Corporate Trustee of the Paul
A. Filippi Trust Agreement.

Nos. 2001–130–Appeal, 2001–169–Appeal.

Supreme Court of Rhode Island.

Feb. 18, 2003.

Richard W. MacAdams, Providence/Kris Macaruso Marotti, Thomas a. Tarro, III, Warwick/Denean M. Russo, Providence, for Plaintiff.

Lori Caron Silveira, John A. McFadyen, III/Howard E. Walker, Providence, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, FLANDERS, GOLDBERG, JJ. and WEISBERGER, C.J. (Ret.).

## OPINION

WILLIAMS, Chief Justice.

This family feud involves the sad but all too familiar story of a family united solely by its eldest member during his life and then fiercely divided after his death.[1] The plaintiffs, Peter Filippi (Peter), Carolyn Filippi Cholewinski (Carolyn) and Paula

---

1. As Abraham Lincoln said in his 1858 address at the Republican State Convention in Illinois, "[a] house divided against itself cannot stand * * *." Abraham Lincoln, Address at the Republican State Convention, Springfield, Ill. (June 16, 1858).

Consagra (Paula) (collectively referred to as plaintiffs), are decedent Paul Filippi's (Paul or decedent) three adult children from his first marriage. The defendants are Marion Filippi (Marion), who is Paul's widow, and Citizens Trust Company (Citizens), the institutional trustee of Paul's trust. The plaintiffs appeal the trial justice's grant of Marion's motion for a new trial on damages conditioned upon plaintiffs' rejection of a remittitur. They also appeal the judgment that entered in favor of Citizens on the undue influence claim. That judgment entered after the trial justice decided to invoke his right to rule on undue influence in equity and deem the jury verdict on that issue purely advisory. Marion cross-appeals the trial justice's denial of her motions for judgment as a matter of law and the conditional grant of a new trial.

This complex appeal combines two separate actions consolidated before trial and consolidated again on appeal. The first action was for breach of contract against Paul and involved plaintiffs against Marion, as executrix of Paul's estate. The second case named Citizens as defendant in an undue influence action with respect to Paul's 1992 trust amendment. For the sake of clarity, we will address the issues of each individual case *seriatim* but we begin with a recitation of all the relevant facts.

## I

### Facts and Travel

Paul was a businessman and restaurateur. The plaintiffs were born to Paul and his first wife, Elizabeth Filippi: Peter in 1938, Carolyn in 1941 and Paula in 1946. Paul and Elizabeth divorced in 1968.

In 1973, Paul, then fifty-nine years old, married Marion, who then was twenty-four years old. Paul and Marion had three children. Marion gave birth to the couple's first child, Paul, Jr., in 1975. Steven was born in 1979 and Blake arrived one year later.

This controversy centers around Ballards Inn and Restaurant (Ballards), a family business and famous Block Island eatery that Paul acquired during his marriage to Elizabeth. Shoreham, Inc. (Shoreham), a corporation in which Paul held all the shares, owned all of Ballards's physical assets. Ballards opened each season from around Memorial Day to Labor Day. Most, if not all, of the Filippis worked in the restaurant at some point.

Of the three plaintiffs, Paula participated the most in the business. In fact, she worked there every season from age eleven until 1968, when she married Lou Consagra (Lou) and the couple moved out of state. In 1974, Paula returned to Rhode Island and worked a few weekends at Ballards, once filling in as manager. After the weekend she worked as manager, Paula testified that her father said, "I want you to come back and run Ballard's for me * * * and if you do this for me, Ballard's will be yours and you will take care of the family." She initially turned him down, but in the summer of 1976, after his repeated requests, she returned to help her father run Ballards.

Paul fell ill with cancer in 1977 and again in 1979. During his battles with cancer, Carolyn, a registered nurse, assisted in his care and treatment. His serious illness most likely caused him to contemplate his mortality and how he was going to care for his family after he died.[2] Con-

---

**2.** Unfortunately for plaintiffs, Paul followed the admonition of the Latin poet of more than fifteen hundred years ago, "Death plucks my ear and says Live—for I am coming." Catherine Drinker Bowen, Yankee from Olympus:

sequently, at the end of 1979, Paul executed a will and living trust dividing his estate into six equal shares to be held in a marital trust for Marion and family trusts for each of the then existing five children. He amended the trust in 1980 to provide for his newest child, Blake. This was the first of fifteen documents relating to his estate that Paul executed over the last twelve years of his life.

On January 5, 1981, Paul executed a new will and trust providing that each plaintiff was to receive a specific gift of $25,000. Paul divided the remainder of the estate into five parts, granting 25 percent to Marion, 9 percent to Peter for life and 22 percent for the benefit of each of Paul's three youngest children. The trust also granted control of Ballards to an institutional trustee. Later that year, Paul amended the trust to name Peter, Paul and Marion as executors and trustees.

In February 1982, once again Paul revised the trust. He divided the estate into sevenths: three sevenths for Marion, one seventh for Paul's three youngest children, two sevenths for Paula and one seventh for Carolyn and Peter.

The next year, Paul executed a new will that attempted to devise to each plaintiff cottages (Bosworth cottages) that he and Marion owned. He also left money to Marion and certain real property held in trust for her. He then created a marital trust with the residue passing to his three youngest children. Furthermore, he expressly acknowledged plaintiffs' omission from the will but indicated that he believed he adequately provided for them in life. Paula was reappointed co-trustee of the marital and family trusts.

In 1984, Peter, Carolyn and her husband, Clides Brizio (Brizio), formed a limited partnership called Block Island Associates (Associates) to buy and develop a seventeen-acre piece of property known as Ocean View upon which the Ballards property partially encroached. Associates purchased the land for $850,000 with Brizio putting up $200,000, Carolyn providing $40,000 and Peter adding $10,000 of the initial payment and closing costs. Shortly thereafter, the partners of Associates asked Paula to join the partnership in return for her knowledge and expertise. She agreed.

The plaintiffs said that Associates received an offer to purchase Ocean View for $1.85 million in 1985. Thereafter, Paul and plaintiffs discussed the fate of Ocean View. The plaintiffs assert that Paul orally agreed to the following:

(1) Associates would convey Ocean View to Block Island Realty (Realty), Paul's real estate corporation;

(2) Paul would pay the outstanding $600,000 mortgage on the property;

(3) Brizio would recover his investment in Associates;

(4) Paul would keep the portion of the land that Ballards encroached upon;

(5) Plaintiffs would reimburse Paul for the expenses associated with the sale or development; and

(6) Paul and plaintiffs would evenly divide the net proceeds between the four of them.

However, the only evidence of any transaction involving Ocean View is a purchase and sale agreement between Associates and Realty and the resulting deed, indicating that Realty is the sole owner of Ocean View. Neither document referenced the alleged oral agreement between Paul and plaintiffs.

Unfortunately, in June 1986, a fire destroyed Ballards. Paul, Marion, plaintiffs

Justice Holmes and His Family, 409 (Little, Brown and Company 1945) (1944).

and other family members met to discuss what they should do because the restaurant was underinsured. They decided to sell Ocean View and another property that Paul owned with his brother to rebuild Ballards.

In September 1986, Paul sold two small parcels of Ocean View: one for $250,000, paid in full, and the other for $175,000: $50,000 paid in cash and a $125,000 promissory note. The final and largest piece of Ocean View sold in December 1986 for $3.4 million to developers Ephron Catlin (Catlin) and Kenneth Stoll (Stoll). Catlin and Stoll paid $100,000 cash and signed a promissory note for $3.3 million. Following the sale, Paul liquidated Realty and became the holder of the notes.

At the beginning of 1987, Paul revoked his 1983 will and executed a new will leaving his entire estate, including the Shoreham stock, to Marion, except for the proceeds from the sale of Ocean View. He left the Ocean View sale proceeds to his children in equal sixths. In March 1987, when Paul informed plaintiffs of the change, they agreed to decrease their one-fourth share to one-sixth so that Paul could provide for his three youngest children as well.

In need of cash to rebuild Ballards, Paul agreed to subordinate his priority position on the Ocean View mortgage so that Catlin and Stoll could sell the property to a third party. In return, he received a portion of the mortgage in cash along with other payoffs and an easement on the property on which Ballards encroaches.

Upon learning of the subordination, Carolyn expressed to Paul her concerns that the second mortgage would not be honored. She testified that he promised that he would assume the risk of not collecting on the loan and personally guaranteed that she would receive interest on her one-sixth share. Paula asked Paul to memorialize the one-sixth interest in the Ocean View proceeds in writing. He agreed and his attorney drafted the agreement in June. The agreement characterized the one-sixth share in the net proceeds as a gift.

That same month, Peter demanded his one-sixth interest up front, which Paul's accountant, Ronald Nani (Nani) calculated as $260,706. However, Peter accepted a check for $200,000 as partial payment.

Ballards reopened in June but not without fireworks. Paula and Marion had a falling out in July resulting in Paula's departure from Block Island.[3] According to Paula, Marion insisted that she not return or else Marion would take the couple's three young boys to Italy for the summers. By the close of the turbulent season, Stoll had not paid the outstanding amount on the subordinated mortgage on Ocean View or the subordination agreement, both due on October 1. Consequently, Carolyn testified, Paul paid her $13,000 in interest pursuant to his promise until Marion would not allow him to make any more payments.

Because of the tax consequences of the 1987 will, Paul revised this instrument with the help of attorney Paul Silver (Silver). Silver suggested that Paul leave plaintiffs the equivalent of the exemption from the unified gift and estate tax, which totaled approximately $600,000, or $200,000 each. On November 13, 1989, Paul and Marion executed the new estate

---

**3.** The argument was about the Bosworth cottages that Paul attempted to leave to plaintiffs in his 1983 will. Paula requested that in addition to the Ocean View promise, Paul give her the Bosworth cottage he left to her in his 1983 will. When Marion found out about Paula's request, she determined that Paul and Marion owned the cottages jointly, and that, therefore Paul could not leave them to anyone without Marion's consent. Marion refused to consent and advised Paula of her decision in a "stormy confrontation."

plan. It included Paul's will, inter vivos trust, and agreement not to revise the estate plan without Marion's consent. This pour-over will devised the real estate to Marion with the residue of the estate funding two trusts: a marital trust for Marion and the couple's three children, and a family trust for the benefit of plaintiffs. Everything else was left to Marion, including the Shoreham stock.

On May 7, 1992, Paul amended his trust agreement to decrease the amount to plaintiffs from the exemption equivalent amount initially suggested by Silver to $50,000 each. Death "plucked" Paul a few months later.

The plaintiffs alleged that Marion began to exert undue influence over Paul sometime after the execution of the 1989 documents and concurrent with his allegedly deteriorating physical health. They also alleged that Paul's and Marion's agreement not to revise their estate plans without the other's consent was the product of undue influence. The plaintiffs alleged the same for the 1992 trust agreement.

In January 1993, the executors of Paul's estate denied plaintiffs' claims against the estate. As a result, in April of the same year, plaintiffs filed breach of contract claims against Paul's estate in Superior Court. That summer, plaintiffs also filed an undue influence claim against Citizens to contest the 1992 amendment. The cases were consolidated in 1999, subject to the trial justice's discretion to sever.[4]

The trial justice heard Marion's pretrial motions *in limine* seeking to exclude evidence of any oral agreement relating to count 1 (Ocean View), the alleged agreement to share in the Ocean View sale proceeds, and count 3 (Ballards), the alleged agreement between Paul and Paula that he would give her Ballards upon his death if she worked for him. The trial justice denied both motions.

A jury trial commenced in June 2000. Just before trial, the trial justice, with consent of the parties, reserved his decision until the close of evidence on whether to rule on the undue influence claim in equity and consider the jury's verdict merely advisory, or to allow the jury to decide the claim. The defendants moved for judgment as a matter of law at the close of plaintiffs' case, at the close of all the evidence and after the verdict. The jury returned a verdict in favor of plaintiffs on counts 1 and 3. The jury also returned a verdict in favor of plaintiffs on the undue influence claim. After the verdict, however, the trial justice determined the undue influence claim to be equitable in nature and the jury verdict to be purely advisory. The jury made the following award of damages:

| | | |
|---|---|---|
| Peter: | $ 400,000 plus statutory interest on count 1 (Ocean View). | |
| Carolyn: | $ 600,000 plus statutory interest on count 1 (Ocean View). | |
| Paula: | $ 260,706 plus statutory interest on count 1 (Ocean View). | |
| | $2,500,000 plus statutory interest on count 3 (Ballards). | |

In December, the trial justice denied defendants' renewed motion for judgment as a matter of law and motion for a new trial concerning liability, but granted it on the issue of damages unless plaintiffs accepted a remittitur. The remittitur called for a reduction of the jury award as follows:

Peter: Reduced to $ 60,706, plus statutory interest on count 1 (Ocean View).

4. Only Citizens filed a motion in opposition to plaintiffs' motion to consolidate.

Carolyn: Reduced to $260,706, plus statutory interest on count 1 (Ocean View).
Paula: Reduced to $ 8,700, plus statutory interest on count 1 (Ocean View).
Reduced to $322,500, plus statutory interest on count 3 (Ballards).

The plaintiffs accepted the remittitur and judgments entered on December 15 and 21. The plaintiffs and Marion appealed on January 4, 2001.

In February 2001, the trial justice issued his written decision on the undue influence claim. Contrary to the advisory jury verdict, he found in favor of defendants. The trial justice found plaintiffs to be biased and noted that they failed to present any unbiased corroborating witnesses. He found that "[t]here [was] utterly no evidence that Marion was able to over-ride his wishes unless he wanted to let her." Moreover, he explained that although he did not lightly disregard the jury verdict, he was not bound by it. In fact, he found that the verdict did not deserve deference because it probably was a product of the jury's frustration with Paul's conduct involving the contracts as well as Marion's failure to testify truthfully in a few instances. The verdict, he explained, would not have withstood a motion for a new trial. Furthermore, the trial justice concluded that the jury disregarded the instruction that "[i]t is not undue influence * * * if [Paul] was influenced only by his affection and love for Marion and his three younger children."

We begin our discussion with Marion's claim of error in the trial justice's rulings on the motions for judgment as a matter of law and new trial on the count 1 and count 3 breach of contract claims. We then explore the issues relating to damages. Finally, we address the arguments involving the undue influence action.

## II

### Count 1 (Ocean View Claim)

During the trial, plaintiffs testified about their alleged oral agreement with Paul concerning the Ocean View transaction. All three plaintiffs explained their father's agreement to share the proceeds of Ocean View's sale with each of them equally. The only written evidence of the transaction or agreement, however, is in the form of a purchase and sales agreement and a deed, both of which only indicate that Realty, Paul's company, bought the property from Associates, thereby making Realty the sole owner of the seventeen-acre tract of land. Marion filed a motion *in limine* to preclude any evidence of the oral agreement under the statute of frauds and the parole evidence rule. The trial justice denied the motion.

### A

### Motions for Judgment as a Matter of Law

Marion filed a motion for judgment as a matter of law at the close of plaintiffs' case arguing that plaintiffs failed to produce enough evidence on the existence of the agreement because the statute of frauds and the parol evidence rule prevent the evidence of the oral agreement from being considered. Therefore, Marion asserted, there was no evidence that Paul ever agreed to share the net proceeds. Marion filed a motion for judgment as a matter of law at the close of plaintiffs case, at the close of all evidence, and she renewed it after the jury returned its verdict against her. The trial justice denied them all. She avers that the trial justice erred in denying those motions. Specifically, she asserts that he erred in finding that (1) the statute of frauds did not apply to an agreement to divide the proceeds of the development or sale of real property in Rhode

Island, and (2) the agreement was not subject to the parol evidence rule.

 In reviewing a decision on a motion for judgment as a matter of law, we, like the trial justice, examine:

> "the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draw from the record all reasonable inferences that support the position of the nonmoving party. * * * If, after such a review, there remain factual issues upon which reasonable persons might draw different conclusions, the motion for [judgment as a matter of law] must be denied, and the issues must be submitted to the jury for determination." *Marketing Design Source, Inc. v. Pranda North America, Inc.*, 799 A.2d 267, 271 (R.I.2002) (quoting *Martinelli v. Hopkins*, 787 A.2d 1158, 1165, (R.I.2001)).

When there are no relevant factual issues and "defendant is entitled to judgment as a matter of law, then the trial justice should grant the motion and dismiss the complaint." *Id.* at 271–72 (quoting *Swerdlick v. Koch*, 721 A.2d 849, 856 (R.I.1998)).

The parties do not contest the existence of an oral agreement; in fact Marion acknowledged the existence of the oral agreement. Therefore, in the context of our standard of review, there are no factual issues to resolve. Rather, the outstanding issues relate to the trial justice's applications of law. Those issues involve the trial justice's (1) determination that the Ocean View "agreement" between Paul and plaintiffs was a partnership or joint venture agreement, thereby bypassing the statute of frauds, and (2) his ruling that the agreement was not subject to the parole evidence rule.

**1**

### Statute of Frauds

 Marion asserts that Paul, through Realty, purchased Ocean View to save plaintiffs from financial hardship. In other words, she contends that Paul assumed complete responsibility for the financial burden of Ocean View and, in return, he exercised total and sole control and ownership over it. The plaintiffs responded that they were not in financial dire straits but rather, the oral agreement was in furtherance of a partnership to develop and sell Ocean View and share in the proceeds. This distinction is important because plaintiffs and the trial justice cite *Moran v. McDevitt*, 83 A. 1013 (R.I.1912), to support their contention that oral agreements evidencing a partnership for the development and sale of real estate do not fall within the statute of frauds. *See id.* at 1015.

In *Moran*, the parties orally agreed to engage in a partnership for the purpose of "dealing in insurance, brokerage, the sale of real estate on commission, the purchase of tracts of land for the purpose of developing, and selling the same." *Id.* at 1013. The *Moran* opinion focused on the fact that the purpose of the partnership, which the parties laid out in an oral agreement, was to share in the profits and losses resulting from the sale and development of real estate. *See id.* Because the agreement was for a share in the profits and losses that arise from the partnership, the statute of frauds did not apply. *See id.* at 1015. This Court held that an agreement to share in profits and losses derived from the sale of land to a third party need not be committed to writing to be enforceable. *See id.*

The Court explicitly noted, however, that the reason the statute of frauds did not apply to the Moran–McDevitt agreement is because it did not involve a trans-

fer of property between partners. *Id.* The rule is:

> "that such agreements of copartnership can be proven by parol, and are not in violation of the statute of frauds, * * * [because] such contracts do not contemplate any transfer of land from one partner to the other or the creation of any interest or estate therein, do not as between the parties in any way affect the title to realty so bought for copartnership purposes, but that the subject matter of the contract is the profits or losses to be derived from the sale of * * * land." *Id.*

Had such an internal partnership property transfer been part of the Moran McDevitt agreement, the statute of frauds would have applied. *See id.*

The first question in determining if the *Moran* rule applies is whether plaintiffs and Paul formed a partnership to share in the purchase and sale of land. A partnership is "an association of two (2) or more persons to carry on as co-owners a business for profit * * *." G.L.1956 § 7–12–17(a). The decision of whether a particular agreement constitutes a partnership is a question of law. *See Boston & Colorado Smelting Co. v. Smith,* 13 R.I. 27, 34 (1880).

Based on the evidence at trial of the six terms the parties allegedly agreed on concerning Ocean View, *supra,* the parties created a partnership to sell Ocean View to Realty and for Realty to develop and sell it, and for all four partners to share in the proceeds. Like the Moran–McDevitt agreement, the agreement at issue was for two or more persons [5] to enter into a business for profit. This is where the similarities between the facts of *Moran* and the facts of this case end.

Although the trial justice correctly determined that the statute of frauds does not apply to partnership agreements to share in the proceeds of the development and sale of land, he erred in finding that the agreement plaintiffs allege was analogous to that situation. In fact, the partnership agreement before us falls squarely within the explicitly noted exception for transfer of land between partners. The oral partnership agreement for sharing the proceeds of the sale of Ocean View included the transfer of Ocean View between partners. The purchase and sales agreement and the deed were not, as the trial justice indicated, "simply devices to put the title to the subject real estate under Paul Filippi's control so that he could then carry out the real agreement among the parties." In fact, those documents were the foundation of the partnership agreement. As a result, under the *Moran* rule, the statute of frauds does apply to this partnership agreement.

Under G.L.1956 § 9–1–4, which states that "[n]o action shall be brought: (1) Whereby to charge any person upon any contract for the sale of land, * * * unless the promise or agreement upon which the action shall be brought * * * shall be in writing, and signed by the party to be charged * * *." Because the transfer of Ocean View from Associates to Realty was a sale of land, the agreement must be in writing.

Furthermore, the statute of frauds applies not only to the sale of Ocean View but also to the entire agreement. *See Kinden v. Foster,* 60 R.I. 41, 45–46, 197 A.

---

5. For the statute of frauds analysis, it is not important whether the agreement was between Paul and plaintiffs or Realty and Associates. *See* G.L.1956 § 7–12–13 (including both partnerships and corporations as "persons" that may enter into partnerships). This distinction is, however, relevant to the parol evidence discussion and will be addressed therein.

100, 102 (1938). "The claim, as stated, mingles the promise of a matter within the terms of the statute of frauds with the promise of other matters not in themselves within such statute * * * could be proved only by written evidence." *Id.* Each of the plaintiffs testified about the oral agreement and described the transfer of Ocean View as part of the transaction. The transfer of Ocean View was within the statute of frauds while the remaining five terms were not. *See id.* Consequently, under *Kinden*, the entire partnership agreement, including the agreement to share the proceeds of the sale of Ocean View, is subject to the statute of frauds and must be in writing to be enforceable.

The trial justice erred in applying the rule in *Moran* about partnership agreements involving only the profit sharing from the purchase and sale of land and ignoring the explicitly stated scenario that a transfer of property between partners would bring the transaction within the statute. Therefore, he was clearly wrong in finding that the statute of frauds did not apply. Even if the statute of frauds did not apply, the parol evidence rule would have prevented the trial justice or jury from considering any oral evidence in conflict with the written purchase and sales agreement, as discussed *infra.*

### 2

### Parol Evidence

■ "The parol-evidence rule provides that 'parol or extrinsic evidence is not admissible to vary, alter or contradict a written agreement.'" *Paolella v. Radiologic Leasing Associates,* 769 A.2d 596, 599 (R.I.2001) (quoting *Supreme Woodworking Co. v. Zuckerberg,* 82 R.I. 247, 252, 107 A.2d 287, 290 (1954)). "The basis of the rule is that a complete written agreement merges and integrates all the pertinent negotiations made prior to or at the time of execution of the contract." *Fram Corp. v. Davis,* 121 R.I. 583, 587, 401 A.2d 1269, 1272 (1979). A document is integrated when the parties adopt the writing as "a final and complete expression of the agreement." *Id.* Once integrated, other expressions, oral or written, that occurred prior to or concurrent with the integrated agreement are not viable terms of the agreement. *See id.* at 587–88, 401 A.2d at 1272.

■ First, the purchase and sales agreement, which noted Associates as the seller and Realty as the buyer, contained no reference to the previous oral agreement and explicitly stated its integrated status: "[w]e, the parties hereto, severally declare that this instrument contains the entire Agreement between the parties, and that it is subject to no understandings, conditions or representations other than those expressly stated herein." Peter and Paul signed this straightforward three-page document in their capacity as a partner of Associates and president of Realty, respectively. They made no additions or deletions. Second, the deed indicated only one owner—Realty.

Accordingly, the trial justice should have precluded evidence of the oral agreement under the parol evidence rule. The purchase and sales agreement was integrated, as clearly stated in the contract. The plaintiffs offered evidence of the alleged oral agreement, which occurred before the integrated contract, to supplement or explain the entire agreement. Finally, that previous oral agreement calling for a share in the proceeds of Ocean View's sale contradicts the integrated writing that indicates that Realty is the sole owner and the only party with rights in Ocean View.

The plaintiffs contend that the oral partnership agreement and the purchase and sales agreement were two separate agreements—Realty and Associates were par-

ties to the transfer and Paul and plaintiffs were parties to the partnership agreement. Therefore, the parol evidence rule, they assert, does not prohibit evidence of the oral agreement because it was separate from the sale and not being offered to supplement or explain the purchase and sales agreement. At trial, plaintiffs explained that the agreement to sell Ocean View was not between Associates and Realty, but rather between the "persons who were part of and in control of those entities." Furthermore, plaintiffs stated that their interest was not in the real estate but in the proceeds of future transactions. The trial justice agreed that partnership interests are different from the property of the partnership. He went on to explain his understanding as "[t]he agreement among the four partners or joint venturers was to dispose of interest in the real estate held by these, pardon the expression, dummies [Associates and Realty]." However, finding that Associates and Realty were not parties to the agreement to transfer is contrary to the evidence.

First, plaintiffs did not own Ocean View when they entered this oral agreement with their father; Associates owned the property. The only way plaintiffs could establish a partnership agreement concerning Ocean View with their father, as they all allege they did, was in their capacities as partners of Associates; none of the plaintiffs had any individual ownership interest in Ocean View with which to form the basis of a bargain with their father. Moreover, neither Associates nor Realty were "dummy" entities as the trial justice suggested. Both were legally recognized business entities by the Secretary of State's office. Paul established Realty long before Ocean View came into the picture. The plaintiffs and Brizio established Associates with the intention of developing Ocean View without Paul's aid.

Second, Paul's initial partnership proposal called for the inclusion of Brizio, an original Associates partner, resulting a in one-fifth interest for everyone. After learning of the proposal, Brizio wanted to be bought out because of his marital problems with Carolyn. If the sale of Ocean View and the partnership agreement were separate, Paul never would have initially included the lone non-Filippi Associates partner in the partnership equation.

Finally, and most telling, is the evidence relating to the offer Associates received from DeFelice Realty (DeFelice) to purchase Ocean View for $1.85 million in the spring of 1985—a million dollars more than Associates paid for the property. If the transfer of Ocean View were separate from the partnership agreement, there would be no bargained-for exchange. The DeFelice offer serves as evidence of Associates giving up $1 million in potential profit in return for the one-fourth interest in the proceeds of the sale of Ocean View. If the agreement to sell and the partnership agreement were separate, plaintiffs could allege that no more than a gift existed since there would have been no bargained-for exchange. Therefore, the partnership agreement was between Associates and Realty and inextricably tied to Associates's sale of Ocean View to Realty.

Although only Peter, Carolyn and Paula participated in creating the agreement, their actions are binding on the Associates partnership. Each partner is an agent of the partnership and the partnership is bound by the actions of its partners on behalf of the partnership. *See* § 7–12–20(a). Even if plaintiffs' action of agreeing to sell to Realty was "not apparently for the carrying on of the business of the partnership in the usual way * * *," § 7–12–20(b), the other partners, except for Brizio, agreed to the action through their

participation in the oral agreement and such consent gives effect to the action. As for Brizio, the only unaccounted-for Associates partner in the agreement, he knew and approved of the agreement because he sought relief from further financial liability as a step toward ending his marital partnership with Carolyn.

The parties memorialized the agreement to sell Ocean View in a purchase and sales agreement listing Associates as the seller and Realty as the buyer, signed by Paul as the president of Realty, and Peter as general partner of Associates. The document was fully integrated and contained no additions or deletions.

The oral partnership agreement concerning plaintiffs' interest in the proceeds contradicts the terms of the purchase and sales agreement, which passes all the interest in the property to Realty. The purchase and sales agreement is fully integrated and made no mention of any other agreement between the parties. Therefore, neither the trial justice nor the jury should have considered the evidence of the oral partnership agreement to determine the terms of the purchase and sales agreement. The trial justice's finding that the purchase and sales agreement and the deeds "were simply devices to put the title to the subject real estate under Paul Filippi's control so that he could then carry out the real agreement among the parties" ignores the parol evidence rule. Accordingly, we conclude that after the 1985 sale of Ocean View from Associates to Realty, plaintiffs no longer had an interest in the property.

### 3

### "Renewal" of the Promise

■ The plaintiffs contend that even if the trial justice and jury should not have considered the evidence of the oral agreement, subsequent events proved Paul's intent to share the proceeds of the sale

equally with them. The trial justice agreed; "even though Paul's promise was originally made before [the purchase and sales agreement], * * * Paul renewed that promise after the execution of the writing." As an example, the trial justice cited the creation of the 1987 will, providing one-sixth of the proceeds of the sale of Ocean View to plaintiffs, as evidence of the "agreement" to share in the proceeds of the Ocean View sale.

Under the parol evidence rule, the trial justice cannot consider evidence of the alleged partnership agreement that contradicts the purchase and sales agreement. *See Fram Corp.,* 121 R.I. at 587–88, 401 A.2d at 1272. Therefore, he certainly cannot use other evidence in conjunction with the parol evidence in an attempt to create an accumulation of evidence to prove that there was another agreement.

In order for plaintiffs to succeed, there would have to be an agreement subsequent to the purchase and sales agreement that set forth the alleged terms of this partnership. There is no such agreement. There is no evidence subsequent to the purchase and sales agreement sufficient to establish the terms that plaintiffs allege. Neither the family meeting in 1986 at which the entire family decided to sell Ocean View to rebuild Ballards, nor the "signally abrupt will" in 1987 creating a one-sixth interest in plaintiffs upon Paul's death without regard to tax consequences, nor plaintiffs agreement to accept one-sixth a few months later, nor Paul's payment of $200,000 to Peter that June as partial payment of his one-sixth interest, nor Paul's written agreement with Paula provide the terms of a contract indicating that Paul agreed to share proceeds as part of a business venture. Because of the parol evidence rule, there was no contract as a matter of law.

Although the jury found that there was a contract between Paul and plaintiffs, the

jury was allowed to consider the oral partnership agreement. Without this evidence, no reasonable juror could find that there was a contract because the purchase and sales agreement constituted the entire agreement with respect to Associates's sale of Ocean View to Realty. No subsequent occurrence provides sufficient evidence for any reasonable juror to find a contract for a partnership or otherwise. The exception to this, of course, is the written contract between Paul and Paula in 1987 promising her an interest in one-sixth of the mortgage documents.

The effect, however, of Paul's contract with Paula to provide her a one-sixth interest in the "mortgage documents" of the Ocean View property is what the document says it is—a gift. Paul's payment to Peter of $200,000 is the same. Unfortunately for plaintiffs, Paul changed his will numerous times, thereby revoking the 1987 testamentary disposition. The plaintiffs' only possibility of obtaining one-sixth of the proceeds of Ocean View is when their father died. Until his death, Paul had the right to alter his will so long as he was mentally capable to do so. He clearly did this.

Our rules of contract exist for a reason. The power of the written word must remain paramount. The trial justice's ruling provides undue weight to the alleged spoken word. We must give effect to the written word when the law so requires or open the litigation flood gates to the he said, she said "War of the Roses." [6]

**B**

**Motion for a New Trial**

Marion argues also that the trial justice erred in denying her Rule 59 motion for a new trial based on the trial justice's finding that passion and prejudice influenced the jury's verdict. The trial justice denied the motion on liability and granted a new trial on damages unless plaintiffs accepted a remittitur. The issue concerning count 1 is moot because the trial justice should have found for Marion as a matter of law.

**III**

**Count 3 (Ballards Claim)**

This claim focuses on the alleged 1974 oral promise that Paul made to Paula that Ballards would be hers if she came to manage the business during the season each year. In 1976, Paula began managing Ballards and continued to do so each season until 1987. The jury found that Paul's oral promise constituted a legally enforceable contract to convey his interest in Ballards to Paula at his death. Marion filed motions for judgment as a matter of law and for a new trial, contending that plaintiffs failed to prove the "irrevocable will contract" by clear and convincing evidence and that both G.L.1956 § 6A–1–206, applicable through Article 2 of the Uniform Commercial Code (UCC), and § 9–1–4 prohibited such an oral contract. The trial justice rejected both arguments, finding that plaintiffs proved their case by clear and convincing evidence and that the statute of frauds from the UCC did not apply.[7]

At the close of plaintiffs' case, at the close of all the evidence and following the verdict, Marion moved for judgment as a matter of law on this count. She also filed a motion for a new trial after the verdict.

6. War of the Roses (Twentieth Century Fox 1989).

7. Marion failed to raise G.L.1956 § 9–1–4 at trial; therefore the trial justice did not rule on it.

The standard of review for a decision on a motion for judgment as a matter of law applies here as well. The new trial standard is articulated below.

 It is well settled that "the trial justice acts as a 'superjuror' in considering a motion for a new trial." *Rezendes v. Beaudette*, 797 A.2d 474, 477 (R.I.2002) (quoting *English v. Green*, 787 A.2d 1146, 1149 (R.I.2001)). If the trial justice:

> "reviews the evidence, comments on the weight of the evidence and the credibility of the witnesses, and exercises his * * * independent judgment, his * * * determination either granting or denying a motion for new trial will not be disturbed unless he * * * has overlooked or misconceived material and relevant evidence or was otherwise clearly wrong." *Id.* at 478 (quoting *English*, 787 A.2d at 1149).

"If the trial justice determines that the evidence is evenly balanced or that reasonable minds could differ on the verdict, he should not disturb the jury's decision." *Id.* (citing *Perkins v. City of Providence*, 782 A.2d 655, 656 (R.I.2001)). If, however, the verdict fails to do justice because it is against the weight of the evidence, the trial justice should grant the motion. *See id.*

### A

### Contract for a Testamentary Disposition

Marion asserts that the evidence at trial could not reasonably support a juror's conclusion that Paul entered into the legally enforceable contract that Paula alleges. Marion contends that even if there was a contract between Paula and Paul, it fails to defeat a written will, and therefore the trial justice's finding that a contract existed clearly was wrong. Finally, if the oral promise is binding, the estate would be bankrupt, thereby frustrating Paul's overall testamentary purpose of caring for his family.

The alleged contract at issue is not an irrevocable will contract, which is an oral agreement to create mutual wills. *See Lerner v. Ursillo*, 765 A.2d 1212, 1217 (R.I.2001); *Lorette v. Gorodetsky*, 621 A.2d 186, 187 (R.I.1993) (mem.). The contract at issue is an oral contract that contradicts the terms of Paul's will. Although this may be a distinction without a difference, both are held to the same standard.

### 1

### Clear and Convincing Evidence

 "Contracts for testamentary disposition are allowed to stand only when established by clear proof." *Messier v. Rainville*, 30 R.I. 161, 170, 73 A. 378, 381 (1909). More recently articulated is the principle that the existence of such a contract must be proven by clear and convincing evidence. *See Colangelo v. Estate of Colangelo*, 569 A.2d 3, 4 (R.I.1990) (per curiam) (holding that a mother's promise to leave her entire estate in equal shares to her children if they would relinquish any claim to their father's estate must be proven by clear and convincing evidence). We interpret this to mean that to prove the existence of a contract, Paula must prove each element of a valid contract by clear and convincing evidence.

### a

### Contract

 Every contract must be formed though mutual assent or, in other words, an intention to promise or be bound through offer and acceptance. *See Smith v. Boyd*, 553 A.2d 131, 133 (R.I.1989). "[I]t is a party's objective intent that will be considered as creating either an offer or acceptance." *Id.* Objective intent is

determined by the "external interpretation of the party's or parties' intent as manifested by action." *Id.* In addition to mutual assent, a bilateral contract requires mutuality of obligation, which is achieved when both parties are bound legally by the making of reciprocal promises. *See Centerville Builders, Inc. v. Wynne,* 683 A.2d 1340, 1341 (R.I.1996) (per curiam) (citing *Crellin Technologies, Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 7 (1st Cir.1994) (applying Rhode Island law)). Mutuality of obligation fulfills the consideration requirement of contracts. To determine consideration, the Restatement (Second) of *Contracts* § 71 (1981) employs a bargained-for exchange test. Under this test, something is bargained-for "if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." *Id.* § 71(2).

▇▇▇ Marion asserts that the trial justice erred because he required only that the existence of the contract be proven by clear and convincing evidence, but did not require the same level of proof for the content or to the consideration each party gave. As stated above, we interpret this Court's precedent to require that each element of the contract be proven by clear and convincing evidence. In our review of the trial justice's decision on the judgment as a matter of law, we examine the evidence in the light most favorable to plaintiffs, the non moving party.

There is evidence of mutual assent in Paula's testimony; she testified that Paul promised to give her Ballards if she would help manage it during the season and "take care of the family" after he died. The plaintiffs then assert that there were several other indications at trial of Paul's intention to give Ballards to Paula, including three of his testamentary documents, the testimony of three witnesses and a handwritten note to Paula.

The three testamentary documents, the 1979 trust, the 1982 trust and the 1983 will all mention Paula in her managerial capacity at Ballards, but none of the documents indicates that he would give her the restaurant because she agreed to come manage Ballards during the season. The 1979 trust stated, in relevant part:

"In recent years, the management of this operation has to an increasing extent been entrusted to Settlor's daughter, PAULA A. CONSAGRA, and it is Settlor's desire that she continue to manage and operate the same (if such businesses become part of the Trust Estate) so long as she is willing to do so, and remains able to do so *for such compensation as shall be deemed mutually satisfactory between her and the Trustee,* and for so long as the Trustee deems in good faith it economically feasible * * *." (Emphasis added.)

This document does not confirm the existence of any contract. In fact, if anything, this document indicates that in exchange for her work at Ballards, the trustee would compensate Paula, not grant her future ownership. The same is true of the 1982 trust, which contains the same provision.

The 1983 will follows suit. The thirteenth paragraph directs the Trustee to lease the Ballards property to Paula for twenty years at $50,000 per year. Again, there is no evidence of Paul's intent to give Paula the business outright or in return for her services as manager.

The testimony of Ann Filippi (Ann), Mary Frances Scavo (Mary) and Linda Plourde (Linda), although more probative of Paul's intent to leave the business to Paula, is void of any evidence of a bargained-for exchange. Ann testified that Paul stated his intention that Paula own Ballards in the future and that he groomed her to run the business. Mary offered

that she often heard Paul say, about Ballards, "I did this and Paula will have it and she will run it." Finally, Linda testified that Paul often stated that he was going to leave Ballards to Paula. She added that she believed that Paula was to inherit Ballards and support Marion and the kids with the proceeds.

Finally, Paula says that Paul left her a hand-written note on Ballards's letterhead, undated and addressed to "everyone," with a post-script, written somewhat illegibly at the top, saying "P.S. Stock will become valid only on *my death.*" At the pretrial hearing, plaintiffs suggested that this piece of evidence was sufficient to satisfy the statute of frauds. However, this note provides no additional evidence to prove Paula's claim that there was a contract. Even in the light most favorable to plaintiffs, the most this document does is provide evidence of Paul's intent to give Paula the Ballards stock; it does not provide evidence of a contract between Paul and Paula.

Even assuming that the oral promise from Paula is not barred by the statute of frauds and examining all other evidence in favor of plaintiffs, it does not meet the threshold level of clear and convincing evidence of the existence of a contract. Much of the evidence proves Paul's contentment with Paula's management of Ballards and his desire for her to continue to run the business. Some of the evidence suggests that he, at one time, intended to leave Ballards to her, but none of the evidence, save Paula's testimony, shows an exchange of promises between Paul and Paula.

Paula's testimony alone does not establish the existence of a contract by clear and convincing evidence. Absent clear and convincing evidence of a bargained-for exchange, we conclude that no contract existed as a matter of law, and the trial justice did not err in so finding.

**b**

**Promissory Estoppel**

██ The plaintiffs assert that Paul's alleged promise to Paula is enforceable under the doctrine of promissory estoppel. This Court has defined promissory estoppel as: "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance, [and therefore] is binding if injustice can be avoided only by enforcement of the promise." *Alix v. Alix,* 497 A.2d 18, 21 (R.I.1985) (quoting Restatement (Second) *Contracts* § 90 at 242 (1981)). This Court extended the application of promissory estoppel to situations in which the promisee's reliance on the promise was induced, and injustice may be avoided only by enforcement of the promise. *See id.* (citing *East Providence Credit Union v. Geremia,* 103 R.I. 597, 601–02, 239 A.2d 725, 727–28 (1968)).

██ A successful promissory estoppel action must include a clear and unambiguous promise. *See B.M.L. Corp. v. Greater Providence Deposit Corp.,* 495 A.2d 675, 677 (R.I.1985). This Court adopted the following conditions precedent for promissory estoppel:

> " '(1) Was there a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee?

> " '(2) Did the promise induce such action or forbearance?

> " '(3) Can injustice be avoided only by enforcement of the promise?' " *East Providence Credit Union,* 103 R.I. at 603, 239 A.2d at 728.

However, we think it more straightforward to set forth a three-element approach to promissory estoppel as used in other juris-

dictions. To establish promissory estoppel, there must be:

1. A clear and unambiguous promise;

2. Reasonable and justifiable reliance upon the promise; and

3. Detriment to the promisee, caused by his or her reliance on the promise. *See Nilavar v. Osborn*, 127 Ohio App.3d 1, 711 N.E.2d 726, 736 (1998).

■ We also stated in *Alix* that if "the doctrine is applicable in a situation in which consideration is lacking in a contract, then it logically follows that promissory estoppel should be applied to a case in which one of the parties has deliberately failed to perform an act necessary to the formal validity of the contract." *Alix*, 497 A.2d at 21. "More specifically, we assert that when a necessary element of a contract is lacking as a result of one contracting party's failure to act," the benefiting party cannot then assert that the contract is invalid to avoid fulfilling his or her obligation under the contract. *Id.*

Paula's testimony indicates that she abandoned the career for which she was trained so that she could work at Ballards. She had a degree in elementary education from the University of Miami and she never pursued a career related to her degree. On appeal, Paula describes her living conditions during the four months of the Ballards' season as less than desirable and her income of $300–$400 [8] per week as insufficient compensation for her services. Furthermore, she explained that work caused her to be separated from her husband during those months. She asserts that she made these sacrifices in reliance on Paul's promise that he would give her the restaurant.

There is other evidence, however, that speaks to the unreasonableness of Paula's reliance on the alleged promise. Paula

admitted at trial that she was not only aware of Paul's 1979 testamentary documents that entrusted control of Ballards to an institutional trustee and provided that Paula would run the business in return for compensation, but also that she and the family approved these documents. In other words, three years after she says that she accepted Paul's offer, she had written confirmation that if he died, he was not going to leave Ballards to her. Yet, she continued to work.

Paula's promissory estoppel claim fails on every element. First, the promise is unclear and ambiguous. Paul's promise, "I want you to come back and run Ballard's [*sic*] for me * * * and if you do this for me, Ballard's [*sic*] will be yours and you will take care of the family," failed to indicate whether he meant Ballards as the business including the good will or simply the stock of Shoreham, which owned the physical assets of Ballards. The handwritten letter from Paul indicating that the stock will "take effect" upon his death confirms this ambiguity, since Paula asserts he intended to leave her the whole business and not just the physical assets. Furthermore, Paul never clarified what he meant by "you will take care of the family." This is especially confusing since the family included, in addition to Carolyn and Peter, Paul's three youngest children, with whom Paula had no real relationship, and Marion, with whom Paula had a rocky relationship.

Even the trial justice admitted that "the parameters of Paula's interest in Ballards after Paul's death were never clearly defined * * *." In fact, he went so far as to state that "there is no clear and convincing evidence that Paul ever promised to bequeath the total corporate ownership of Ballards to Paula Consagra" and that the

---

**8.** During her final year at Ballards, her income was increased to $500 per week.

only clear and convincing evidence was that Paul promised to leave her "some interest in the profitability of Ballards. * * * He clearly did not promise her that he would leave her unbridled ownership of the business." All that appears to be clearly and unambiguously established then is what Paul *did not* promise to leave to Paula. Thus, we cannot conclude that the promise was clear and unambiguous.

Moreover, in assessing the reasonableness of Paula's reliance, we find that Paula unreasonably relied on the promise after learning and approving of the 1979 will. Her admitted knowledge, understanding and acquiescence that an institutional trustee would control Ballards and that she would manage it for compensation to be determined by her and the trustee destroyed any argument she previously had for reasonably relying on the promise. This Court has held that when there is written, actual notice contradicting the oral promise, such notice deems any reliance on that oral promise unreasonable. *See Galloway v. Roger Williams University*, 777 A.2d 148, 150 (R.I.2001) (per curiam). Consequently, after Paula obtained knowledge of Paul's 1979 will, she no longer could reasonably rely on his promise.

Finally, even if Paula satisfied the first two elements, she suffered no detriment. While Paula argues that she went back to work at Ballards based on Paul's oral promise that Ballards someday would be hers, Paul compensated her for her services. At trial, Paula never took issue with the adequacy of that compensation nor did she present evidence about her compensation, contrary to her allegation on appeal. She undisputedly received between $300 and $400 per week as well as a room to stay in for her services. Her decision to work was voluntary, and Paul paid her for that work. Under these circumstances we refuse to find such detriment that justice requires enforcement of the alleged contract.

■ In addition, and regardless of the failure to satisfy the promissory estoppel requirements, the trial justice should have granted Marion's motion for judgment as a matter of law. Viewing the evidence in a light most favorable to Paula, no reasonable juror could find that there was clear and convincing evidence of the promise she alleges. To reiterate, "[w]here an oral agreement of this nature [to make a will] rests on parol evidence, it must be established by clear, satisfactory and convincing evidence. Such a contract is to be looked upon with suspicion and can only be sustained when established by the clearest and strongest evidence, and such evidence must be so clear and forcible as to leave no reasonable doubt of its terms or character." *Johnson v. Flatness*, 70 Idaho 37, 211 P.2d 769, 774 (1949).

As discussed in the contract section *supra*, the only evidence Paula presented of the promise was her recollection of it. All other testimony and evidence offered failed to establish not only the terms of the contract but also its mere existence.

The trial justice instructed the jury on the high degree of proof required under this standard: "the evidence in favor of [Paula's] claim must be so clear, direct, and weighty, and convincing as to enable you to come to a clear conviction without hesitancy of the truth of the precise facts in issue." After reviewing plaintiffs' evidence on count 3 (Ballards), the trial justice should have realized either at the close of plaintiffs' case, at the close of all the evidence or after the jury verdict, that no reasonable jury could have found that Paula's evidence was clear and convincing. As a result, he erred in denying the Rule 50 motion.

## 2

### Statute of Frauds

Marion argues that Paula's testimony about the alleged oral agreement with Paul falls within the statute of frauds, and therefore, is not enforceable unless it is in writing. She cites both § 9–1–4(5)[9] and the UCC to support her position. We need not reach this issue because plaintiffs failed to prove their claim by clear and convincing evidence.

## B

### New Trial Based on Passion and Prejudice

Marion again argues that the trial justice erred in denying her Super.R.Civ.P. 59 motion for a new trial, which alleged that passion and prejudice influenced the jury's verdict. The trial justice denied the motion on liability but granted a new trial on damages unless plaintiffs accepted a remittitur. This issue is moot because the trial justice should have granted the motions for judgment as a matter of law.

## IV

### Remittitur

Both Marion and plaintiffs appeal the trial justice's ruling with respect to the grant of a new trial conditioned upon plaintiffs' acceptance of remittitur. This issue on counts 1 (Ocean View) and 3 (Ballards) is also moot because the court wrongfully denied motions for judgment as a matter of law.

---

**9.** The relevant part of § 9–1–4 provides:
"No action shall be brought:
(5) Whereby to charge any person upon any agreement which is not to be performed within the space of one year from the making thereof; * * * unless the prom-

## V

### Undue Influence

The plaintiffs appeal the trial justice's finding that Marion did not unduly influence Paul to make the 1992 trust amendment, which reduced plaintiffs' shares to $50,000 each. Before trial, the trial justice, with consent of counsel, reserved the right to rule on the undue influence claim if he determined it to be an equitable question. The trial justice based his decision on the fact that this claim might, as it in fact did, call for the cancellation of a trust, which is equitable in nature. *See Concannon v. Concannon,* 116 R.I. 323, 328, 356 A.2d 487, 491 (1976) ("The Superior Court has exclusive original jurisdiction, except as otherwise provided by law, of suits and proceedings in equity and it is within the power of that court to advise and direct trustees as to the management of trust estates and to enter decrees for that purpose."). After the jury verdict, the trial justice found the undue influence claim to be equitable and invoked his right to issue a decision. The plaintiffs aver that the trial justice's decision to rule and his disregard of the jury's advisory verdict deprived them of their constitutional right to a jury trial.

## A

### Ruling on an Equitable Basis and Constitutional Issues

The plaintiffs assert that the trial justice's decision to rule on the undue influence claim in equity deprived them of their constitutional right to a trial by jury. The plaintiffs argue that the trial justice erred in focusing on the type of action,

---

ise or agreement upon which the action shall be brought, or some note or memorandum thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person by him or her thereunto lawfully authorized."

action to cancel, and on the relief sought, cancellation of the trust amendment, instead of on the testamentary nature of the trust in issue. They argue that it was testamentary in nature because the trust was entirely funded by the pour-over provision of the will. We conclude that a revocable inter vivos trust receives the same treatment in equity as a trust and is not more similar to a will contest. *See Concannon*, 116 R.I. at 330, 356 A.2d at 492. As the trial justice indicated in the post-trial hearing, the revocable inter vivos trust "has been adapted to avoid the consequence of making testamentary disposition by will." The fact that the will funds the trust does not change the situation. "Thus, in assessing whether a particular cause of action merits a jury trial, we look to the historical nature of the claim, tracing its origins and striving to discern analogies to forms of action known to the common law before the merger of law and equity." *Egidio DiPardo & Sons, Inc. v. Lauzon*, 708 A.2d 165, 171 (R.I.1998) (citing *Bendick v. Cambio*, 558 A.2d 941, 944 (R.I.1989)).

The trial justice reasoned that before the Constitution was adopted in 1843, trust claims were triable only in equity, and therefore, this claim would have been defined as a trust action and not review of a will. We agree with the trial justice's reliance on the historical distinction between law and equity as it relates to this claim. Consequently, the trial justice acted properly in ruling on the undue influence claim and, therefore, plaintiffs do not have a constitutional right to a jury trial in this equitable matter.

**B**

**Effect of Jury's Advisory Verdict**

Rule 39(c) of the Superior Court Rules of Civil Procedure states:

"In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury or the court, with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right."

Before the law and equity courts merged,[10] this Court held that it was an abuse of discretion for a trial justice sitting in equity in a contract dispute to decline to use the jury-trial option to determine the factual issues underlying the parties rights as dictated by the agreement. *See Maryland Casualty Co. v. Sasso*, 98 R.I. 483, 488, 204 A.2d 821, 824 (1964). Some years later, this Court applied *Sasso* to the modern rules of civil procedure requiring the trial justice to conduct a jury trial for "underlying legal issues in a civil action which were traditionally cognizable at common law when money damages were sought even when, as here, a complainant requests substantial equitable relief." *Egidio DiPardo & Sons, Inc.*, 708 A.2d at 170.

█ The jury heard the entire Filippi case. After reserving his right to decide the undue influence claim in equity, the trial justice did so on July 3, 2000, after the jury verdict and deemed the verdict on that claim purely advisory. The jury found for the plaintiff on counts 1 and 3 and the undue influence claim. In his decision of February 8, 2001, the trial justice found for defendants on the undue influence claim. He stated that although he did not lightly disregard the jury's advisory verdict, he found that Paul's conduct and Marion's impeachment disturbed the jury. Furthermore, he determined that the jury disregarded the undue influence

---

**10.** The law and equity courts merged in 1965 when the General Assembly repealed G.L. 1956 § 9–14–21 and adopted the new rules of civil procedure. *See* P.L.1965, ch. 55, § 28.

instruction that "[i]t is not undue influence * * * if [Paul] was influenced only by his affection and love for Marion and his three younger children."

The question of whether undue influence exists is a fact-intensive inquiry. *See Tinney v. Tinney*, 770 A.2d 420, 438 (R.I.2001). This Court defines undue influence as the "substitution of the will of [the dominant] party for the free will and choice [of the subservient party]." *Id.* at 437–38 (quoting *Caranci v. Howard*, 708 A.2d 1321, 1324 (R.I.1998)). "In determining what constitutes undue influence in a particular case, then, a trial justice ordinarily examines the totality of circumstances, including the relationship between the parties, the physical and mental condition of the grantor, the opportunity and disposition of a person wielding influence, and his or her acts and declarations." *Id.* at 428 (citing 23 Am.Jur.2d *Deeds* (*Undue Influence*) § 203 (1997); 25 Am.Jur.2d *Duress and Undue Influence* § 31 (1997)).

The trial justice examined the totality of the circumstances and determined that there was no undue influence. We agree. Marion, Paul's wife of nineteen years had every right to exert influence over Paul, and she did just that. There is no evidence of her substituting her will for the free will of Paul.

Because of his findings about the jury verdict on the undue influence claim, the trial justice considered the matter as if it appeared in the form of a motion for new trial. On that basis, he found that he would have granted a new trial because "[t]his was not a case where reasonable minds could differ as to the conclusions to be drawn from the evidence. This was a case where based on the weight of the credible evidence and the more reasonable inferences there is only a single conclusion on the merits." Accordingly, he entered judgment for defendants.

Although we agree that the advisory jury verdict should receive a great degree of deference in factual determination, it is still subject to the same scrutiny as that of other jury verdicts. If the jury verdict would not have withstood a motion for new trial in a case at law, then the same goes for an advisory jury verdict in an equity claim. We conclude the trial justice was not clearly wrong and did not overlook or misconceive material evidence in his determination.

## Conclusion

With respect to counts 1 (Ocean View) and 3 (Ballards), the defendant Marion Filippi's appeal is sustained and the judgment of the Superior Court is vacated. Concerning the undue influence claim, the appeal of the plaintiffs Peter Filippi, Paula Consagra and Carolyn Cholewinski is denied and dismissed and judgment for the defendant Citizens is affirmed. The papers of the case are remanded with instructions to enter judgment on counts 1 and 3 for the defendant Marion Filippi.

Justice LEDERBERG participated in all proceedings but deceased prior to the filing of this opinion.