DECISION
This case is before the Court for decision following a non-jury trial on a complaint by First Tee Capital Advisors, Ltd. d/b/a Clubhouse Capital ("Clubhouse Capital") against Anthony Caron, Justin Caron ("the Carons"), J A Golf, LLC, and Highland Golf, LLC. In this contract dispute, Plaintiff seeks to recover damages for breach of contract, promissory estoppel, and unjust enrichment. Jurisdiction is pursuant to G.L. 1956 § 8-2-14.
 I. FACTS AND TRAVEL
In pursuit of their interest in the acquisition of a golf course in Rhode Island, Anthony Caron and Justin Caron were introduced to Clubhouse Capital, a real estate advisory firm that specializes in golf course financing, during April 1998. George Marderosian, principal and managing director of Clubhouse Capital and First Tee Capital Advisors, Ltd., indicated to the Carons the potential availability for purchase of Seaview Country Club ("Seaview"), a nine-hole golf course and banquet facility located in Warwick, Rhode Island. At the time, Clubhouse Capital was involved in the efforts of Michael Integlia, then-owner of Seaview, to refinance his existing loan for the golf course. Marderosian explained to the Carons that the previous work performed by Clubhouse Capital on behalf of Integlia would expedite their attempts to secure financing for the purchase of Seaview. In particular, Clubhouse Capital had already developed a relationship with FMAC Golf Finance Group, LLC ("FMAC"), their "principal lender," with respect to the refinancing of Seaview previously initiated by Integlia, a relationship that would allegedly streamline the financing process for the Carons. Via letter dated April 22, 1998, Anthony Caron requested the services of Clubhouse Capital in order to expedite the process of financing and purchasing Seaview.
On or about May 19, 1998 or May 20, 1998, the Carons entered into an agreement with Clubhouse Capital. According to the terms of the agreement drafted by Marderosian, Clubhouse Capital agreed to perform those services necessary to secure financing for the Caron's purchase of Seaview. The scope of these services included the preparation of the formal debt offering, the coordination of inspections and third-party reports, and the conducting of negotiations with the lender. The agreement states that Clubhouse Capital "ha[d] been involved with this property for several months" and "already ha[d] most of the property-related items needed to complete the loan submission." In addition, the agreement set forth some general terms and conditions that would be reflected in the loan proposal from FMAC, which "knows the property and has already reviewed much of the typical underwriting materials." Finally, the agreement called for a fee of "1.5% of the gross loan amount, payable at closing" to Clubhouse Capital in exchange for the aforementioned services to be provided on behalf of the Carons.
Around the same time that Clubhouse Capital and the Carons entered into this agreement, FMAC issued a term sheet to the Carons that stipulated the general terms and conditions of the loan. Though the term sheet did state that the amortization schedule would contain monthly payments that may be adjusted by a multiplier that reflects "the seasonal cash flow of the golf operation," the letter did not specify a precise multiplier to be applied to each monthly payment. Rather, the term concerning potential seasonal payments in the amortization schedule states that the precise multipliers would be determined at a later time and "will be mutually agreed to by FMAC and the BORROWERS." In addition to signing the term sheet, the Carons made a "good faith deposit" of $5,000 to FMAC on May 20, 1998.
The Carons decided to purchase Seaview from Integlia in the beginning of June 1998. Although they had not yet secured permanent financing, the Carons wished to procure the higher seasonal revenue stream earned by most golf courses during the summer months. Integlia agreed to provide the Carons with temporary financing after they placed a down payment of $1 million. However, in order to induce the Carons to secure permanent financing quickly, the deal with Integlia charged the Carons 9% interest for the first ninety days and 12% interest subsequently until permanent financing had been obtained. With an expectation that they would be able to secure financing expeditiously, the Carons agreed to the interest payment schedule with Integlia. On or about June 3, 1998, sellers Seaview Country Club, LLC and SCC, LCC and buyers J A Golf, LLC, Highland Golf, LLC, Anthony Caron, and Justin Caron executed a purchase and sales agreement. The Carons are the sole shareholders of J A Golf and Highland Golf, the former incorporated as the real estate holding company and the latter as the management company. After closing with Integlia on June 8, 1998, the Carons began operating Seaview the next day on June 9, 1998.
On August 14, 1998, FMAC presented the Carons with a commitment letter. Though most of the terms reflected those found in the term sheet issued and signed in May, the seasonal payment in the amortization schedule elicited concern from the Carons, as they believed they might not be able to fulfill their obligations. The schedule called for no payments from December through April and standard payments in May and November. However, the commitment letter required accelerated payments of 150% in June and October, 200% in July and September, and 300% in August; over 83% of the total yearly payment had to be made in a five month period, with over 58% of the total yearly payment made between July and September. The Carons did not believe they would be able to keep up with the monthly payments because the amortization schedule did not accurately reflect Seaview's seasonal revenue. They argued that the seasonal payment schedule does not reflect Seaview's accumulation of higher overhead costs during the admittedly busier golf season of late spring, summer, and early fall. Moreover, the schedule does not reflect the income generated by Seaview's banquet facilities.
As a result of what they saw as a disjunction between Seaview's monthly revenue and the monthly payments required according to FMAC's amortization schedule, the Carons contacted FMAC directly to express their concerns. In response, FMAC issued to the Carons a new commitment letter, dated September 11, 1998, that included a few pertinent revisions. Though FMAC did not change the payment schedule, the new commitment letter contained a clause that granted the Carons the option to submit to FMAC after six months, information that would allow the lending institution to reconsider an amendment of the seasonal payment schedule. However, FMAC retained "sole and absolute reasonable discretion" to determine whether any change in the amortization schedule would be made. The Carons did not find this new term to be satisfactory, as they had no assurance that any change would be made and it still required that they relinquish all authority over whether and to what degree the seasonal payment would be restructured. By this point, the Carons already had begun making increased interest payments to Integlia pursuant to their temporary financing agreement. Nevertheless, Anthony Caron testified that they continued to work with FMAC through October 7, 1998, in the hope that a mutually acceptable commitment letter could be negotiated.
On October 21, 1998, Anthony Caron wrote a letter to Pat Casey, his lawyer, indicating he believed that negotiations with FMAC had reached an impasse and that the Carons now planned to seek financing from an alternate lending institution. Subsequently, FMAC returned the "good faith" deposit of $5000 to the Carons on November 3, 1998. Clubhouse Capital had already completed a number of services necessary for the sale and purchase of Seaview. Justin Caron testified that Clubhouse Capital arranged and coordinated necessary third-party reports and studies, including hydrology, survey, and title work. Clubhouse Capital also assisted in the transfer of a liquor license. Suzanne Accardo of Lenders Title Services testified that Marderosian continued to perform services on behalf of the Carons through November 4, 1998. Marderosian claimed that Clubhouse Capital had performed all the services necessary to entitle them to the compensation enumerated in the contract. When he was informed that the Carons intended to secure alternate financing, Marderosian became concerned that Clubhouse Capital would not be compensated for the services it had rendered. He testified that he spoke with either Justin or Anthony Caron, who supposedly informed him that Clubhouse Capital would be compensated regardless of the lender. Without the assistance of Clubhouse Capital, the Carons secured financing through Commerce Bank and closed the transaction at the end of January 1998. Upon this closing, Clubhouse Capital presented the Carons with an invoice for their fee of 1.5% of the loan amount, which the Carons refused to pay.
The Plaintiffs initiated the within action claiming 1) breach of contract, 2) promissory estoppel, and 3) unjust enrichment. Pursuant to Rule 50(a) of the Rhode Island Superior Court Rules of Civil Procedure, the Court entered a judgment as a matter of law against the claim of unjust enrichment, for which there was no sufficient evidentiary basis as presented by the Plaintiffs.
 II. STANDARD OF REVIEW
Rule 52(a) of the Rhode Island Superior Court Rules of Civil Procedure provides that "in all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon. . . ." R.I. Sup. Ct. R.C. P. Rule 52(a) (2003). In accordance with this authority in a non-jury trial, "the trial justice sits as trier of fact as well as law." Hood v. Hawkins,478 A.2d 181, 184 (R.I. 1984). "Consequently, she weighs and considers the evidence, passes upon the credibility of witnesses, and draws proper inferences." Id. "The task of determining credibility of witnesses is peculiarly the function of the trial justice when sitting without a jury."State v. Sparks, 667 A.2d 1250, 1251 (R.I. 1995) (citing Walton v.Baird, 433 A.2d 963, 964 (R.I. 1981)). "It is also the province of the trial justice to draw inferences from the testimony of witnesses. . . ."Id.; see also Rodriques v. Santos, 466 A.2d 306, 312 (R.I. 1983) (the question of who is to be believed is one for the trier of fact). When rendering a decision in a non-jury trial, the Rhode Island Supreme Court has interpreted Rule 52(a) to mean that "the trial justice need not engage in extensive analysis to comply with this requirement." White v.Le Clerc, 468 A.2d 289, 290 (R.I. 1983). Thus, "even brief findings will suffice as long as they address and resolve the controlling factual and legal issues." Id.
 III. BREACH OF CONTRACT
The Plaintiffs claim that the Defendants breached the contract entered into by the parties on or about May 20, 1998, an agreement that stipulated that the Defendants would pay a fee of 1.5% of the loan amount at closing in exchange for the Plaintiffs' services connected with securing the financing necessary for the Defendants' purchase of Seaview Golf Course. Plaintiffs contend that they rendered services in accordance with the terms of the contract and never received compensation. They claim to have provided the use of underwriting, title, survey, and coordination services, which amounts to performance under the contract regardless of whether FMAC or an alternate lending institution eventually provided the Carons with financing. Moreover, they argue that Defendants did not make sufficient good-faith attempts to effectuate the contract with Clubhouse Capital but rather dealt in bad faith when Defendants sought alternate financing without proper notification. Finally, the Plaintiffs aver that the Defendants had no good-faith basis for their rejection of the financing terms offered by FMAC; they sought alternate financing simply to avoid paying fees to both FMAC and Clubhouse Capital.
The Defendants contend that the terms of the contract with respect to compensation between Clubhouse Capital and the Carons does not entitle Clubhouse Capital to "1.5% of the gross loan amount payable at closing." The Defendants gesture toward the operative phrase "payable at closing," language they characterize as plain and unambiguous. According to this term, the Defendants argue that the Plaintiff's right to compensation does not arise until closing. Thus, since there was no closing with FMAC, the lending institution secured by Clubhouse Capital, then there is no right to compensation. Additionally, they assert that the language of this agreement would not support recovery for the Plaintiffs even if they had secured a lending institution that was "ready, willing, and able" to provide financing according to terms set forth by the Carons; the contract designates "closing" as the condition precedent required for Clubhouse Capital to be entitled to compensation for its services.
It is well settled under Rhode Island law that a contract is "an agreement which creates an obligation," the elements of which are "competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation." Rhode Island Five v. MedicalAssociates of Bristol County, Inc., 668 A.2d 1250, 1253 (R.I. 1996) (citing Lamoureaux v. Burrillville Racing Assn., 161 A.2d 213, 215 (R.I. 1960)). In order to create a valid contract, parties must intend to be bound by the terms of the agreement. UXB Sand Gravel, Inc. v.Rosenfeld Concrete Corp., 641 A.2d 75, 79 (R.I. 1994). However, the parties to a contract may find that they disagree about precisely what obligations arise from the terms. "Unless the terms of a written contract are ambiguous, it should be interpreted as a matter of law in accordance with its plain terms." R.I. Depositors Econ. Prot. Corp. v. Coffey Martinelli, Ltd., 821 A.2d 222, 226 (R.I. 2003) (citingClark-Fitzpatrick, Inc./Franki Foundation Co. v. Gill, 652 A.2d 440, 443 (R.I. 1994)). "In determining whether a contract is clear and unambiguous, the document must be viewed in its entirety and its language be given its plain, ordinary, and usual meaning." Samos v. 43 E. RealtyCorp., 811 A.2d 642, 643 (R.I. 2002) (citing Rotelli v. Catanzaro,686 A.2d 91, 94 (R.I. 1996)). "[A] contract is ambiguous only when it is reasonably and clearly susceptible of more than one interpretation." Id. "In the absence of an ambiguity, courts afford the term its plain, ordinary, and literal meaning, enforcing what is deemed to be the objective manifestation of the parties' expectations." Am. Commerce Ins.Co. v. Porto, 811 A.2d 1185, 1195 (R.I. 2002). "When a contract is clear and unambiguous, `the parol-evidence rule bars evidence of a previous or contemporaneous oral promise extrinsic to an integrated contract that would purport to contradict or modify the express terms of the written contract.'" Samos v. 43 E. Realty Corp., 811 A.2d 642, 643 (R.I. 2002) (citing Egidio DiPardo Sons, Inc. v. Lauzon, 708 A.2d 165, 176 (R.I. 1998)).
In this instance, the contract between Plaintiffs and Defendants shares a significant resemblance-both in form and content-to a real estate broker's contract, a special kind of agreement governed by a set of more specific rules for their interpretation and enforcement. Accordingly, those rules give guidance to the court's analysis herein. One aspect that makes broker's contracts unusual is that they may be unilateral-as opposed to bilateral-agreements. A unilateral broker's contract contains an offer to pay a commission to a broker upon production of a purchaser. Corbin elucidates the characteristics of a unilateral broker's contract with the following:
 "The most commonly recurring case is one in which the owner employs a broker to find a purchaser able and willing to buy, on terms stated in advance by the owner, and in which the owner promises to pay a specified commission for the service. This is an offer by the owner, the broker's power of acceptance to be exercised by the actual rendition of the requested service. Here the only contemplated contract between the owner and the broker is a unilateral contract — a promise to pay a commission for services rendered.
 Cases are very numerous in which the owner, after the broker has fully performed the requested service, fails to make conveyance to the purchaser and refuses to pay the commission. Such a refusal is not the revocation of an offer; it is the breach of the fully consummated unilateral contract to pay for services rendered. If the requested service is merely the production of a purchaser able and willing to buy on definitely stated terms, the broker has a right to his commission even though the owner at once refuses to accept the purchaser's offer." Judd Realty, Inc. v. Tedesco, 400 A.2d 952, 956 (R.I. 1979) (quoting 1 Corbin, Contracts § 50 at 199 (1963)).
Thus, if the broker fully performs the requested service in accordance with the terms of the agreement, then the broker is entitled to the commission or fee to which the parties assented. However, the broker may not be entitled to the commission or fee if the broker has not fully performed under the contract.
In order to determine whether a broker fully performs those services stipulated in the agreement, Rhode Island law recognizes the following rule:
 "A broker is the effective agent, or the procuring cause, when he is the first broker to interest the prospective purchaser in the property, when he causes such purchaser to inspect or view the property, and when he conducts negotiations concerning a sale thereof with the prospective purchaser. A broker has sufficiently performed and is entitled to compensation when he or she has produced a prospective purchaser who is ready, willing, and able to purchase at the price and terms of the seller." Griffin v. Zapata, 570 A.2d 659 (1990); Rustigian v. Celona, 478 A.2d 187, 190 (R.I. 1984); Judd Realty, Inc. v. Tedesco, 400 A.2d at 955 (R.I. 1979).
The aforementioned rule "generally applies in situations in which no special contract delineates what constitutes special performance thereunder." Rustigian v. Celona, 478 A.2d at 190; Judd Realty v.Tedesco, 400 A.2d at 955; Gettler v. Caffier, 165 A.2d 730 (1960). Unless the contract itself clearly delineates what constitutes the fulfillment of the broker's obligation, "[t]he broker has the burden of proving by a fair preponderance of the evidence that he produced a purchaser ready, willing, and able to buy on the seller's terms." Judd Realty v. Tedesco, 400 A.2d at 957; Avedisian v. Gasparian, 135 A.2d 837 (1957). The burden is rightfully placed upon the broker, because the "broker is in a better position than the seller to protect his legitimate expectations by including, in the brokerage contract, a provision that the broker is entitled to its commission when it produces a ready, willing and able buyer whom the seller, for whatever reason, refuses to accept." Sparksv. Fid. Nat'l Title Ins. Co., 294 F.3d 259, 267 (1st Cir. 2002).
Nevertheless, Courts have held that the party who enters into an agreement with a real estate broker must operate in good faith in determining whether to accept or reject the vendor or purchaser obtained by the broker. Still, the law grants such a party a good deal of subjective latitude in assessing his satisfaction, as long as the party is not arbitrary or capricious. "The test of adequate performance by the broker under such an arrangement is not whether the person for whom the service is rendered should be satisfied with the service but whether he is actually satisfied. The dissatisfaction of the obligor must, of course, be genuine and not inspired by ill faith or capriciousness."McAllister Hotel, Inc. v. Porte, 98 So.2d 781, 783 (Fla. 1957); Burke v.Daughters of the Most Holy Redeemer, Inc., 26 A.2d 460 (Pa. 1942).
Here, the Plaintiffs' breach of contract claim fails when the terms of the agreement are strictly construed and applied according to their plain meaning. The agreement between Clubhouse Capital and the Carons qualifies as a legally binding contract, from which arise obligations for both parties to perform according to its terms. To be sure, Clubhouse Capital was the procuring cause of the loan proposal offered to the Carons by FMAC; if there had been a closing between the Carons and FMAC, then Clubhouse Capital would have been entitled to its stated fee. However, this closing never occurred, and the terms of the contract clearly stipulate that such a closing is a condition precedent to Clubhouse Capital's right to compensation. Eventually, a closing did occur with Commerce Bank, the lending institution secured by the singular efforts of the Carons, though the Plaintiffs do insist that Clubhouse Capital provided Commerce Bank with some third-party assessments and title services. Clubhouse Capital's involvement in the closing with Commerce Bank is minimal at best and certainly is not sufficient to justify compensation. Therefore, regardless of the reasons why a closing never occurred between FMAC and the Carons, a strict reading of the unambiguous terms of the agreement does not entitle Clubhouse Capital to compensation.
Even in light of the aforementioned rules designed to encourage good-faith dealings in the unilateral agreements between brokers and the other parties, the Plaintiffs' breach of contract claim still fails. The Court must determine whether Clubhouse Capital secured financing for the Carons with a lending institute ready, willing, and able to provide financing according to the terms set forth by the Carons. This question reduces to a determination of whether the Carons acted in good faith or bad faith when they 1) rejected the loan proposal offered to them by FMAC through the services provided by Clubhouse Capital; and 2) pursued alternate financing through Commerce Bank without the involvement of Clubhouse Capital. The Plaintiffs argue that the loan proposal eventually offered by FMAC conforms in all respects to the term sheet signed by the Carons on May 20, 1998, which does include a provision stating that the amortization schedule may include monthly payments adjusted according to the seasonal revenue of the golf course. The Defendants convincingly respond that the provision makes such seasonal payments merely a possibility and only then after both the Carons and FMAC had mutually agreed to the schedule. Moreover, the Defendants did not contemplate at the time they signed the term sheet that FMAC would present them with an amortization schedule featuring an inordinately high percentage of the yearly payment in the span of three months. Despite efforts to negotiate a different seasonal payment schedule with FMAC, the Carons decided to seek alternate financing given the increased unlikelihood of agreeing upon mutually acceptable terms with FMAC and in lieu of the increased interest payments due to Integlia. In this Court's opinion, the Carons' dissatisfaction with the severe amortization schedule was reasonable and constituted a genuine ground for the good faith rejection of the loan proposal. FMAC did not represent a lending institution ready, willing, and able to provide financing to the Carons according to their clearly delineated terms, and the Carons never violated the standard of good faith with respect to their dealings with Clubhouse Capital. Thus, the Plaintiffs' claim of breach of contract must fail.
 IV. PROMISSORY ESTOPPEL
The Plaintiffs further argue that the Defendants promised to compensate Clubhouse Capital for the services rendered even after a financing agreement between the Carons and FMAC appeared to be uncertain. In support of this claim, the Plaintiffs cite the testimony of Justin Caron, who admitted that he told Clubhouse Capital that they would discuss a fee when the Carons finally secured financing. The Plaintiffs contend that they continued to provide services and coordinate third-party reports on behalf of the Carons through November 1998 in reliance on the supposed promise that they would be entitled to the fee stipulated in the contract even if the Carons did not secure financing through FMAC. Thus, the Plaintiffs assert, Clubhouse Capital is entitled to the stipulated fee of 1.5% of the loan amount because it reasonably relied-to its detriment-upon a promise explicitly made by the Defendants.
The Defendants respond that Plaintiffs' claim under the doctrine of promissory estoppel fails in two respects. First, they argue that the Plaintiffs cannot show a clear and unambiguous promise, the first element for any claim under this doctrine. Second, the Defendants maintain that such an off-hand oral promise-if there were found to be one — clearly contradicts the express language of the written contract between Clubhouse Capital and the Carons, and therefore it was unreasonable for the Plaintiffs to rely on this purported promise. As reasonable reliance is the second element under the doctrine of promissory estoppel, the Defendants argue that the Plaintiffs' claim would still fail.
Under appropriate circumstances, the Court has applied the doctrine of promissory estoppel in order to promote substantive justice. Rhode Island law adopts the doctrine as defined in the Restatement (Second) of Contracts: "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promise of a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." East ProvidenceCredit Union v. Geremia, 239 A.2d 725, 728 (R.I. 1968) (quoting Restatement (Second) Contracts § 90 at 242 (1981)). The doctrine of promissory estoppel provides "a substitute for a consideration, rendering a gratuitous promise enforceable as a contract," and thus "the acts of reliance by the promisee to his detriment [provide] a substitute for consideration." Hayes v. Plantations Steel Co., 438 A.2d 1091, 1096 (R.I. 1982) (citing East Providence Credit Union v. Geremia, 239 A.2d at 727). It must not be forgotten that "[a]n essential part of the promissory-estoppel doctrine is the necessity that the promise be made for the purpose of inducing the promisee or the third person to forbear."B.M.L. Corp. v. Greater Providence Deposit Corp., 495 A.2d 675, 677 (R.I. 1985). Therefore, it is vital that "[a] successful promissory estoppel action must include a clear and unambiguous promise." Filippiv. Filippi, 818 A.2d 608, 625 (R.I. 2003).
For many years, Rhode Island law employed the following three-prong analysis to determine whether the doctrine of promissory estoppel should be applied in a given situation: "1) Was there a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee? 2) Did the promise induce such action or forbearance? 3) Can injustice be avoided only by enforcement of the promise?" East Providence Credit Unionv. Geremia, 239 A.2d at 728. More recently, the Court has clarified this analysis with the following three-element approach that is now utilized in numerous other jurisdictions: "To establish promissory estoppel, there must be 1) A clear and unambiguous promise; 2) Reasonable and justifiable reliance upon the promise; and 3) Detriment to the promisee, caused by his or her reliance on the promise." Filippi v. Filippi, 818 A.2d at 625.
In considering Plaintiffs' claim for compensation under the doctrine of promissory estoppel the court finds that said claim must fail. First, did Defendants make a clear and unambiguous promise? It is Marderosian's contention that the Defendants made an oral modification to their agreement that promised to compensate Clubhouse Capital for its services regardless of which lending institution financed the loan. On the other hand, Justin Caron acknowledges only that an off-handed discussion concerning compensation for Clubhouse Capital may have occurred after the Carons had secured financing with another lending institution. Given the credible evidence on the record, this court is not convinced that a promise with any particularity was ever made. It is not a promise to pay a specific amount, nor is it a promise to compute compensation for services according to some new, mutually agreeable formula. A statement so murky and oblique-a statement specifically contradictory of the terms of the written agreement which calls for payment only in the event of a closing with FMAC-is not a clear and unambiguous promise. As such it cannot satisfy the first element for a claim under the doctrine of promissory estoppel.
Second, was the Plaintiffs' reliance upon this vague promise reasonable and justified? In this case, the Plaintiff's reliance can only be viewed as reasonable and justified, if they had sufficient reason to believe that the Defendants' commitment to an oral contract modification had been made. Although it is well settled that parties are indeed, free to modify a written agreement orally, "the party alleging the modification must show that the parties demonstrated both subjective and objective intent to be bound by the new contract's terms." GBM Acquisitions, Inc. v. SusanAdams d/b/a The Waterfront Cafe, 823 A.2d 1121, 1128 (R.I. 2003) (citingFondedile, S.A. v. C.E. Maguire, Inc., 610 A.2d 87, 92 (R.I. 1992). Absent such a showing, the general rule in Rhode Island is "that when there is written, actual notice contradicting [an] oral promise, such notice deems any reliance on that oral promise unreasonable" Filippi v.Filippi, 818 A.2d at 627 (quoting Galloway v. Roger Williams University,777 A.2d 148, 150 (R.I. 2001) (per curiam)). The contract between Clubhouse Capital and the Carons clearly delineates the obligations of both parties, including the conditions under which Clubhouse Capital would be entitled to compensation. The Plaintiffs offer no evidence of any subjective or objective intent of the Defendants to be bound by a subsequent oral modification changing the payment conditions. Not even a partial payment was ever made to the Plaintiffs after this supposed subsequet promise was made. Further, the evidence suggests that the small amount of work that may have been performed by Maderosian during October and November of 1998 was not at the personal request or with the personal knowledge of either Caron. In fact, the record indicates that the Defendants pretty much avoided Maderosian after they were unsuccessful in reaching a satisfactory financing arrangement with FMAC. Thus, it can hardly be said that Defendants, through their behavior, manifested a subjective or an objective intent to be bound by a purported subsequent oral promise to pay. Without a clear, unambiguous promise from which subjective intent might be inferred, and without any other objective manifestation by Defendants of a commitment to be bound by any oral modification to the written contract, the reliance by Clubhouse Capital on such an illusory promise was neither reasonable nor justified. Thus, their claim also fails under the second element of promissory estoppel.
Finally, because Plaintiffs cannot satisfy the first two elements of estoppel, they cannot recover against the Defendants regardless of whether they suffered damages or detriment.
 CONCLUSION
After review of the entire record, the Court finds that the Plaintiffs fail to carry their burden in showing by a fair preponderance of evidence that the Defendants breached their written contract. Also, the Court finds that the Plaintiffs fail to fulfill the requisite elements for recovery under the doctrine of promissory estoppel. Accordingly, judgment enters for the Defendants.
Counsel shall submit appropriate judgment for entry in accordance with this decision.