**ETHERIDGE OIL CO.**

v.

**Harold T. PANCIERA, et al.**

**Civ. A. No. 91–0147B.**

United States District Court, D. Rhode Island.

March 12, 1993.

---

Michael B. Fines, Harris K. Weiner, Adler, Pollock & Sheehan, Providence, RI, for plaintiff.

Harold T. Panciera, pro se.

William T. Shea, pro se.

Richard W. MacAdams, MacAdams & Wieck, Providence, RI, for third party defendant Heritage Bank.

Kevin M. Brill, Corrente & Brill, Corrente & Brill, Providence, RI, for third party defendant Hampton Etheridge.

## OPINION

FRANCIS J. BOYLE, Senior District Judge.

### I. Background

Plaintiff has sued three individual defendants who executed personal guaranties of payment of a fuel oil supply contract between plaintiff and Marbella & Co., a corporation owned by the three individual defendants. Because two of the individual defendants are now involved in bankruptcy proceedings, the action was heard with respect to the claim against defendant William T. Shea only.

Marbella & Co. operated and later purchased a truck stop located near Interstate 95 in Kenly, North Carolina. On March 14, 1989, Marbella & Co. entered into a supply contract with plaintiff Etheridge Oil Co. for the delivery of its needs of fuel oil. The contract was for a term of one year from

March 6, 1989 to March 5, 1990. The contract provides that, after the initial term, the contract was to be automatically renewed from month to month but could be cancelled at any time by thirty (30) days prior written notice. It does not specifically state who could cancel.

Paragraph 1(d) of the contract provided that "Marbella will pay Ethco [Etheridge Oil] for all fuels *on or before ten days from date of delivery* of fuel to the premises. Payment will be made by draft on Marbella's bank account at the Heritage Bank in Kenly, North Carolina, under authority provided to Ethco by Marbella." (emphasis added). Mr. W. Hamp Etheridge (hereinafter Etheridge), President of Ethco, was also Chairman of the Board of Directors of Heritage Bank. Paragraph 5 of the contract stated that "[the] contract shall be governed by the laws of the State of North Carolina." Paragraph 7 of the contract provided that the "agreement [could] be modified only by a written modification agreement executed by the parties hereto."

Etheridge's business dealings with Marbella were conducted with Harold T. Panciera (hereinafter Panciera), a Marbella principal. Depending upon the volume of business, the truck stop required an average of 3 to 5 loads of fuel per week at a cost of $6,000.00 to $8,000.00 per load. Defendant claims that Panciera and Etheridge agreed to three separate subsequent modifications of the supply contract.

First, in the summer of 1989, environmental testing of the truck stop's fuel lines and tanks was required. To accomplish the testing, it was necessary to completely fill each of the truck stop's four 20,000 gallon tanks. The tanks were filled between August 20, 1989 and August 25, 1989, at a total cost of $48,561.65. To accommodate this spike in the normal delivery schedule, Etheridge and Panciera strayed from the contract terms requiring payment within 10 days of delivery. In a letter to Panciera, dated July 10, 1989, Etheridge, stated:

[o]ur credit terms have been to draft your bank account on a transport load basis; net ten (10) days from the date of each delivery. However, we will be happy to assist you during the tank and line testing period, only, by filling the tank with product; providing your fuel manager, Mr. Sherrill Creech, will call us each day to report the number of gallons sold. When an average tanker load, in gallons, is sold, Mr. Creech and I will mark the lowest invoice number on the tanker load. I will then draft your bank account at the Heritage Bank ten (10) days from that date.

Due to the fact that this varies from our standard contract agreement, this letter will serve as clarification. If you are in agreement with this special agreement, please have Mr. Creech contact us when you wish to have the tanks filled.

This letter was signed by Etheridge and apparently Mr. Creech contacted Etheridge as provided in the letter and had the tanks filled. It is undisputed that defendant Shea knew nothing of this agreement.

Second, although the evidence of specific dates and the sequence of events is not crystal clear, at some point later in 1989 Panciera and Etheridge adopted an arrangement extending the period between a delivery date and the date Etheridge would draft Marbella's account from 10 days to 12 or 13 days.

Third, because Marbella encountered trouble paying for deliveries, in early April of 1990 Etheridge placed Marbella on a "cash basis." In his own words, Etheridge "cut off" Marbella and Marbella had to pay for fuel at the time of deliveries. Sometime thereafter, Etheridge determined to again extend credit to Marbella.

Trouble with the account became most serious in the period from March 19, 1990 to April 3, 1990, when no payment was made for nine invoices and one payment was $90.00 deficient. The result was, after applying credits, a debt in the amount of $65,229.13. The parties agree that this is the correct amount, plus interest, outstanding on Marbella's account. An account summary prepared by plaintiff indicates that Etheridge placed the Marbella account on a cash basis at that time on April 5, 1990. (Plaintiff's Exhibit 25.)

Paragraph 8 of the supply contract provides that "the principals of Marbella join in

this Agreement to guaranty performance and payment by Marbella." Plaintiff now seeks payment from the defendant, William T. Shea, a principal of Marbella, under the provisions of his guaranty. Defendant Shea contends that the parties to the underlying agreement have so modified the original agreement as to acquit him of responsibility as guarantor.

## II. Discussion

The parties agree that the general rule in North Carolina is that "a material alteration of a contract between a principal debtor and creditor without the guarantor's consent will discharge the guarantor from [his] obligation." *Kirkhart v. Saieed,* 98 N.C.App. 49, 389 S.E.2d 837, 840 (1990). Defendant contends that the general rule applies to this case and that the three modifications made to the supply contract by Etheridge and Panciera discharged him from his guaranty. Plaintiff claims that the personal guaranty given by defendant Shea remains in full force and offers four arguments against the application of the general rule.

### A. Validity of the Purported Modifications to the Supply Contract

█ Plaintiff first argues that the purported modifications to the supply contract are invalid and therefore cannot serve as a basis to discharge a guarantor. Plaintiff first claims that because the modifications were not made in writing as required by paragraph 7 of the original contract, they fail.

A contract to supply fuel constitutes a contract for the sale of goods governed by the North Carolina version of the Uniform Commercial Code. N.C.Gen.Stat. § 25-2-107 (1992).[1] Furthermore, the North Carolina U.C.C. recognizes and governs requirements contracts such as the fuel supply contract between Etheridge Oil and Marbella. N.C.Gen.Stat. § 25-2-306 (1992). Section 25-2-209(2) of the North Carolina U.C.C. provides that "[a] signed agreement which excludes modification ... except by a signed writing cannot be otherwise modified." N.C.Gen.Stat. § 25-2-209(2) (1992). In oth-

er words, subsection (2) permits the parties to prescribe their own "statute of frauds." Section 25-2-209(4), however, states that "[a]lthough an attempt at modification ... does not satisfy the requirements of subsection (2) ... it can operate as a waiver." N.C.Gen.Stat. § 25-2-209(4) (1992). The North Carolina comment to subsection (4) explains that "this subsection would seem to accord with prior law in North Carolina" which held that a written contract may be modified by parol agreement even though the instrument provides that any modification must be in writing. Subsection (4) then, "is directed primarily toward conduct after formation of the contract which will constitute a waiver notwithstanding a provision in the contract that excludes modification ... except by a signed writing." N.C.Gen.Stat. § 25-2-209(4), N.C. cmt., (1992). Furthermore, North Carolina courts have recognized that the intent of subsection (4) is to give legal effect to the parties' actual later conduct. *See Varnell v. Henry M. Milgrom, Inc.,* 78 N.C.App. 451, 337 S.E.2d 616, 619 (1985). Because the subsequent conduct of Etheridge Oil and Marbella conformed to each of the modifications, Etheridge Oil cannot now question the validity of those modifications.

At least as to one of the alleged modifications, the special agreement to accommodate environmental testing of the tanks and lines, there was a writing, signed by Etheridge, and accepted by Marbella according to the terms of the writing. Accordingly, this modification actually complied with paragraph 7 of the supply contract. Plaintiff's argument against the validity of the modifications fails.

█ Plaintiff also argues that the modifications fail for lack of consideration. Section 2-209(1) of the North Carolina U.C.C., however, provides that "[a]n agreement modifying a contract within this article needs no consideration to be binding." N.C.Gen.Stat. § 25-2-209(1) (1992). Accordingly, plaintiff's second argument also is without merit.

---

**1.** Sales of a variety of fuel products, including contracts to supply gas, have been held to constitute sales of goods within the meaning of Article 2 of the Uniform Commercial Code. *See* 67 Am.Jur.2d *Sales* § 53 (1985 & Supp.1992).

### B. Materiality of the Alleged Modifications

Plaintiff next argues that "the minor and temporary modification of [the supply contract's] payment terms did not adversely affect Defendant Shea's position." (Plaintiff's Brief at 4.) Plaintiff argues the modifications were not sufficiently material to discharge defendant's guaranty. In order to discharge a guarantor, the alteration to the underlying contract must be material. *Branch Banking and Trust Co. v. Creasy*, 301 N.C. 44, 269 S.E.2d 117, 125 (1980). Under North Carolina common law, "[i]f the creditor enters into a binding agreement with the principal debtor to extend the time of payment or performance, there has been a material alteration of the contract, and the [guarantor] is discharged." *Id.* Although to be binding under North Carolina common law an agreement to extend time of payment must be "definite as to time, and [ ] supported by consideration," the North Carolina U.C.C. expressly provides that contract modifications need not be supported by consideration. N.C.Gen.Stat. § 25–2–209(1) (1992).

Two of the alleged modifications operated to extend the time of payment. First, the modification to accommodate the environmental testing extended the time of payment from ten days from delivery of the product to ten days from the actual sale of the product. Second, the modification in the credit period from ten days to twelve days extended time of payment. Both modifications were definite as to time and, under the U.C.C., were not required to be supported by consideration. These modifications were material for the purposes of discharging a guarantor. *See Branch Banking and Trust Co. v. Creasy*, 269 S.E.2d at 125.

In addition to extending the time of payment, the first two alleged modifications also increased the amount of credit extended and increased defendant's risk. Furthermore, the third alleged modification drastically altered the method of payment under the supply contract. Because North Carolina courts have defined materiality only in very limited circumstances, it is necessary to look to the law of other jurisdictions for a more general definition of materiality. In general, "the test of materiality is not whether the altera-tion ultimately harmed or benefitted the guarantor, but whether it substantially affected a contractual right." *Lawndale Steel Co. v. Appel*, 98 Ill.App.3d 167, 53 Ill.Dec. 288, 423 N.E.2d 957, 963 (1981). In *Lawndale Steel Co.*, the court held that a price increase of one third "varied the 'manner' and 'circumstances' of [the guarantor's] original obligation under his contract of guaranty, and increased his risk." *Id.* Accordingly, the court held that the price increase discharged the guarantor. *Id.* Other courts have held that increases in the amount of credit extended to a debtor can increase a guarantor's risk and operate to discharge the guarantor. *See, e.g., Gritz Harvestore, Inc. v. A.O. Smith Harvestore Products, Inc.*, 769 F.2d 1225, 1232 (7th Cir.1985) (cases cited therein); *Bank of New England v. Klein*, 86 B.R. 897 (S.D.Tex.1988) (construing Massachusetts law); *Southeastern Automotive Warehouse, Inc. v. McCurdy*, 205 Ga.App. 550, 422 S.E.2d 574 (1992); *West Cash & Carry Bldg. Materials of Savannah, Inc. v. Liberty Mortgage Corp.*, 160 Ga.App. 323, 287 S.E.2d 320 (1981); *Greenwood Packing Corp. v. Newman, et al.*, 147 A.D.2d 673, 538 N.Y.S.2d 283 (N.Y.1989).

The special agreement to accommodate the environmental testing provided for a bulk delivery costing $48,561.65, an amount far in excess of the average delivery of $6,000.00 to $8,000.00 worth of product. To compound the risk to the defendant, the normal procedure of drafting Marbella's account ten days from delivery was extended to provide for drafting of the account ten days from the actual sale of the equivalent of a tanker load of product. As a result, this modification both increased the amount of credit extended to Marbella and prolonged the period for repayment. Because the modification placed the defendant at increased risk, the defendant is discharged from his guaranty.

Similarly, the extension of the repayment period from ten days to twelve days permitted an average of one additional delivery (on credit) per repayment cycle and thereby increased the defendant's risk. Using plaintiff's estimates, one additional delivery per repayment cycle increased the average credit outstanding at a given point in time by ap-

proximately $7,650.67. *Id.* The resulting increase in risk to the defendant also operates to discharge defendant from his guaranty.

Finally, by placing the account on a cash basis from April 5, 1990 until July 18, 1990, Etheridge significantly changed the nature of the risk that defendant agreed to guaranty. Without speculating "whether [this] alteration ultimately harmed or benefitted the guarantor," this wholesale change in payment method did "substantially affect[ ] a contractual right" of the guarantor. *See Lawndale Steel Co. v. Appel*, 423 N.E.2d at 963. The cash basis modification, therefore, is also sufficiently material to discharge the defendant from his guaranty.

### C. Defendant's Acquiescence to Modifications

■ Next, plaintiff argues that circumstances support an inference that defendant had knowledge of and acquiesced to the modifications to the supply contract. Plaintiff is correct that a guarantor is not discharged "where the guarantor has knowledge of and assents, either expressly or by implication, to such change." *Lawndale Steel Co. v. Appel*, 423 N.E.2d at 963. The evidence was uncontroverted, however, that defendant Shea had no knowledge of the contract modifications. In fact, Etheridge himself testified that he had never met or talked with defendant prior to trial. Etheridge also admitted he had no direct knowledge that defendant was aware of the modifications. In light of the evidence, there is absolutely no basis to determine that defendant assented to the modifications and plaintiff's argument therefore fails.

### D. Partial Discharge

■ Finally, plaintiff argues that if the court finds that material modifications discharge defendant, defendant should be released from the guaranty only "to the extent that the credit extended is beyond the credit guaranteed in the supply contract." (Plaintiff's Brief at 2.) Plaintiff proceeds to interpret the modifications to have resulted in the extension of an additional two days of credit or one shipment of petroleum. The court assumes that, in arriving at this figure, plaintiff was referring to the second alleged modification, the extension of the payment grace period from 10 days to 12 days. Plaintiff ignores the fact that the extension of time permitted Marbella to remain in business, to continue to purchase fuel on credit, and thereby to further expose its guarantors to additional risk.

■ Moreover, plaintiff misconstrues the reasoning underlying the cases it cites in support of its partial discharge argument. *See Union Carbide Corp. v. Katz*, 489 F.2d 1374 (7th Cir.1973); *see also Wishart v. Gates Rubber Co. Sales Division*, 163 So.2d 503 (Fla.Dist.Ct.App.1964); *American Tobacco Co. v. Chalfen*, 260 Minn. 79, 108 N.W.2d 702 (1961); *Riccar America Co. v. Daniels*, 261 Or. 539, 495 P.2d 708 (1972); *Schluderberg–Kurdle Co. v. Trice*, 198 Va. 85, 92 S.E.2d 374 (1956). These cases all involved guarantors who had specifically limited their liability to a fixed dollar amount in the contract. Because the total amount of credit extended to the principal debtor had no impact on the limited liability of these guarantors, the courts held that the guarantors were discharged only to the extent that the credit extended exceeded their liability limits. These cases are distinguishable from the instant case, where Shea's guaranty is without limit. *See, e.g., Lawndale Steel Co. v. Appel*, 423 N.E.2d at 963 (distinguishing *Union Carbide Corp. v. Katz*, 489 F.2d 1374 (7th Cir.1973)). Partial discharge is inappropriate where the modification to the original agreement substantially effects a contractual right of the guarantor, such as placing him at increased risk. *See id.* Accordingly, plaintiff's argument that defendant Shea should be only partially discharged from his obligation is without merit.

### III. Conclusion

Because of material modifications to the original supply contract, defendant Shea is discharged from his guaranty. **Judgment should enter for the defendant.**