DECISION
This matter is before the Court for decision following a bench trial on the merits. The Plaintiffs, CFN, Inc. (CFN), Frank Zabatta, and Wanda Zabatta (collectively, Plaintiffs), seek to enjoin Defendant Drake Petroleum Company, Inc. (Drake or Defendant) from foreclosing two mortgages securing loans in connection with a contract for the supply of fuel and the re-imaging of a gas station. In addition, Plaintiffs seek an order discharging the mortgages, terminating the security interest in the recorded financing statement against Plaintiffs' property, and a declaration that Plaintiffs have fulfilled all of their contractual obligations. The Plaintiffs also seek an award of compensatory damages, together with interest, costs, and attorney's fees. Defendant counterclaims for breach of contract, seeking a judgment in the amount of $109,261.53, plus attorney's fees, costs, and expenses, as well as an order vacating the Temporary Restraining Order[1] and permitting Defendant to proceed with foreclosure of the mortgages on Plaintiffs' property. *Page 2 
 I Facts and Travel
CFN is a Rhode Island corporation operating a gas station, convenience store, and car wash located at 1525 Mineral Spring Avenue, North Providence, Rhode Island (Property). (Tr. 70.) Anthony Zabatta (Zabatta) is the president of CFN, and the real estate on which CFN operates is owned by Zabatta's parents, Frank and Wanda Zabatta (Zabattas). (Tr. 70.) Drake is a distributor of Sunoco brand gasoline and other related products. (Compl. ¶ 5.) At the end of 2005, following the expiration of a previous fuel supply contract with Sunoco, Zabatta began negotiations with George Giacobbi and Gary Plumer (Plumer), the area manager for Drake. (Tr. 71-72.) During these negotiations, the parties discussed the terms by which CFN would purchase fuel from Drake, a signing bonus that Drake would provide to CFN, and the re-imaging of the gas station as dictated by Sunoco standards.[2]
These negotiations were memorialized in an August 25, 2006 letter of intent (Letter of Intent) drafted by Drake and executed by Zabatta on September 6, 2006. (Tr. 27; Pl.'s Ex. 3.) In the Letter of Intent, Drake proposed to (1) provide CFN with a $100,000 signing bonus; (2) convert the gas station to the Sunoco Horizon Image; (3) supply Sunoco branded gasoline; and (4) provide $2,000 annually for maintenance. (Pl.'s Ex. 3.) More specifically, as part of the re-imaging process, Drake proposed:
 "[r]emoval of existing mansard canopy fascia with installation of Sunoco blue vertical fascia. Will also round canopy corners with installation of new graphics, paint location, including building to specifications, provide new twin pole ID and 3 product LED price *Page 3 
sign reimage dispensers, and install Horizon graphics on each side of the car wash building. Drake's total expense will be approx[imately] $40,000.00." (Pl.'s Ex. 3.)
In the months leading up to the parties' execution of the Dealer Sales Contract (Contract), Plumer assembled vendor bid proposals in order to calculate the re-imaging budget. (Def.'s Ex. C.) On December 27, 2006, the parties executed the finalized Contract and Guaranty.[3] (Pl.'s Ex. 2.) In addition to stipulating the terms for the purchase and supply of gasoline, [4] Drake also agreed to provide CFN with a cash advance of $100,000 as a signing bonus and $40,000 "to install improvements at the premises, including but not limited to the installation of a new twin pole ID digital price sign, refac[ing the] canopy with Sunoco fascia and Horizon decals, re-decal[ing the] dispenser and install[ing] valances and paint[ing] premises to Sunoco specifications."[5]
(Pl.'s Ex. 2 ¶ 25.)
In order to repay the $140,000 loan, [6] the Contract specified that $0.0311 would be added to each gallon of gasoline actually purchased by CFN. (Pl.'s Ex. 2 ¶ 26.) By adding $0.0311 to *Page 4 
each gallon, the loan would be fully amortized by the time CFN fulfilled its obligation to purchase 4,500,000 gallons of gasoline. (Pl.'s Ex. 2 ¶¶ 9, 26.) In the event the Contract was terminated early, CFN would be required to pay Drake the sum of all of the following: (1) principal balance remaining on the $140,000 loan; (2) any and all costs, expenses (including attorneys fees), and damages arising as a result of a default; and (3) any and all other sums owed by CFN. (Pl.'s Ex. 2 ¶ 26.)
As additional security for the $140,000 loan, at the time the Contract was executed, the parties concurrently executed a note, guaranty, security agreement, a mortgage securing the payment of the $140,000 loan, and a second mortgage securing the performance of obligations under the Contract (Loan Documents). (Tr. 66-68.; Pl.'s Exs. 2, 11-14.) The Loan Documents ensured that CFN's obligation to repay the loan and its performance obligations under the Contract were secured by mortgages on the Property.
Following execution of the Contract, Plumer began the re-imaging process. In January 2007, he contacted Chris Krebs (Krebs) at Everbrite — an ID sign manufacturer for Sunoco — to request the specifications for the gas station's ID sign to be used in the permit application with the City of North Providence. (Tr. 94-95, 110-11; Def.'s Ex. H.) Krebs completed the engineering drawings for the seven-foot sign in April 2007, and Plumer submitted the application. (Tr. 110-11; Def.'s Ex. G.)
Throughout the course of the re-imaging, Plumer hired the contractors and oversaw the renovations and construction at the Property. Plumer contends that at several points throughout the re-imaging, requests were made by CFN leading to expenditures exceeding what had been budgeted for in the Contract by $21,761.53 (Overruns). (Tr. 118; Def.'s Ex. J.) As a result, in *Page 5 
December 2007, Plumer presented Zabatta with an Agreement to Amend Dealer Sales Contract (Amendment), which Zabatta refused to sign.[7] (Tr. 61-62, 127; Pl.'s Ex. 10.)
Zabatta now contends that Drake knew about many of its requests before calculating the $40,000 budget and should have increased the loan amount under the Contract to reflect these costlier expenditures. (Pl.'s Post Trial Mem. 6.) Plumer contends that these expenditures were made after execution of the Contract and with Zabatta's knowledge that the requests would result in overages and would necessitate execution of a contract amendment. (Def.'s Reply Mem. 1.)
In the months that followed, market conditions led to reduced sales at the gas station and Zabatta's gasoline orders reduced by half. (Tr. 53-54.) As a result, Zabatta approached Plumer about a temporary allowance[8] to assist CFN in competing with a new Hess station that had opened nearby. (Tr. 53-54; 79.) Although Plumer may have accommodated the request on a few orders, Drake was ultimately unable to reduce the price, and Zabatta indicated to Plumer that CFN wished to terminate the Contract and "look elsewhere." (Tr. 53-54, 56, 80.)
In connection with this termination request, on June 3, 2008, Plumer faxed Zabatta a letter (Pay-off Letter) reflecting the unamortized balance of the loan, as well as the Overruns from the re-imaging. (Tr. 56, 80; Pl.'s Ex. 8.) The Pay-off Letter stated that "Drake would agree to mutually terminate [the Contract] at any point in the future that [CFN's] balance [was] paid in full." (Pl.'s Ex. 8.) Drake agreed to terminate the Contract if the account balance of $136,522.33 — reflecting the remaining amortization balance and the re-imaging Overruns — was paid off. (Tr. 125.) Zabatta claims he did not question the amount stated in the Pay-off Letter, having previously seen the Overruns amount in the Amendment. (Tr. 99-100.) Although *Page 6 
Zabatta did not immediately pay off the account balance indicated in the Payoff Letter, he began looking for another oil company, eventually signing with Irving. (Tr. 81-83.)
On or about December 29, 2008, CFN tendered a check to Drake in the amount of $107,251.91 (Check). The check amount, with the exception of some disputed credits, represented the fully amortized balance of the $140,000 loan due under the Contract.[9]
(Tr. 82-83, 91.) Drake subsequently cashed the Check, and CFN thereafter affiliated with Irving. (Tr. 83.)
On January 20, 2009, a Notice of Default (Notice) was sent to CFN notifying Zabatta that the Contract was in default, and requesting payment of the additional $21,761.53 representing the outstanding expenditures for the re-imaging. (Tr. 92; Def.'s Ex. B.) The Notice stated that:
 "[a]lthough Drake received a check dated December 29, 2008 in the amount of $107,215.91, the balancing remaining under the Contract [was] $21,761.53. Until said amount is paid to Drake, the Contract will remain in full force and effect. . . . If nothing is done within said time period, legal proceedings, including but not limited to a foreclosure action, will be instituted against CFN and you personally." (Def.'s Ex. B.)
CFN failed to comply with the Notice, and Defendant alleges that Plaintiffs are in default under the Contract. (Def.'s Reply Mem. 2.) As a result, Drake notified CFN of its intention to invoke its rights under the mortgages and to foreclose.
CFN now seeks declaratory and injunctive relief to prevent foreclosure. Drake counterclaims to recover the $21,761.53 Overruns, as well as lost profits from the approximately 3,500,000 gallons of gasoline not purchased under the Contract. (Tr. 129.) *Page 7 
 II Standard of Review
The Court decides non-jury trials pursuant to its power under Rule 52, which provides that "[i]n all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon." Super. R. Civ. P. 52(a). Under Rule 52, "the trial justice sits as a trier of fact as well as law." Parella v. Montalbano,899 A.2d 1226, 1239 (R.I. 2006) (quoting Hood v. Hawkins,478 A.2d 181, 184 (R.I. 1984)). As a result, the trial justice "weighs and considers the evidence, passes upon credibility of the witnesses, and draws proper inferences" from the evidence presented.Id. Furthermore, an extensive analysis and discussion of the evidence and testimony is not required to comply with the mandates of Rule 52; rather "brief findings and conclusions are sufficient if they address and resolve the controlling and essential factual issues in the case." Hilley v. Lawrence,972 A.2d 643, 651 (R.I. 2009) (quoting Donnelly v. Cowsill,716 A.2d 742, 747 (R.I. 1998) (citation omitted)).
 III Discussion A The Contract
In the instant matter, Plaintiffs argue that Drake agreed to the Overruns prior to signing the Contract. (Pl.'s Post Trial Mem. 6.) Plaintiffs contend that when they executed the Contract, they assumed the Overruns were incorporated into the $40,000 loan for the re-imaging, and they claim that Drake, having knowledge of these costlier requests, could have and should have negotiated a higher amount for the re-imaging budget or scaled back the renovations.Id. *Page 8 
Plaintiffs assert that the Overruns are not covered by the Contract and that they should not be liable for the additional sums expended beyond the $40,000 in the Contract. Id.
Alternatively, Drake challenges the accuracy of Plaintiffs' assertions and avers that the Overruns were requested and agreed to in the months subsequent to signing the Contract. (Def.'s Reply Mem. 1.) Drake claims that the Overruns were properly incorporated into the Contract through a subsequent unilateral amendment in December 2007 and that Plaintiffs are now in default for having failed to pay for the Overruns. (Def.'s Reply Mem. 2; Pl.'s Ex. 10.)
 1 The Merger Clause
Plaintiffs contend that Drake agreed to the items that constitute the Overruns before the Contract was executed. (Pl.'s Post Trial Mem. 6.) Defendant asserts, however, that despite Plaintiffs' "subjective expectations" resulting from the parties' negotiations, paragraph 15 of the Contract specifically provides that the terms embodied in the Contract were a complete and exclusive expression of the parties' agreement.[10] (Def.'s Reply Mem. 2.) Under the Uniform Commercial Code[11] (U.C.C.) as adopted by Rhode Island:
 "Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented, *Page 9 
 "(a) By course of performance, course of dealing, or usage of trade (§ 6A-1-303); and
 "(b) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." G.L. 1956 § 6A-2-202.
Therefore, assuming arguendo that discussions occurred during the parties' negotiations regarding the subject matter leading to the Overruns, evidence of these discussions would be inadmissible under § 6A-2-202 and the merger clause found in paragraph 15 of the Contract.
It is well settled in Rhode Island, that "in the absence of fraud or mistake, parol or extrinsic evidence is not admissible to vary, alter or contradict a written agreement." Supreme WoodworkingCo. v. Zuckerberg, 82 R.I. 247, 252, 107 A.2d. 287, 290 (1954). Such a rule ensures that the parties' written contract is the only evidence of their transactions and protects them against the uncertainty of oral testimony regarding the transactions.Id. (citing Myron v. Union R.R. Co.,19 R.I. 125, 32 A. 165 (1895)). Under the parol evidence rule, a completely integrated written agreement merges and integrates all the pertinent oral negotiations made at the time of, or prior to, execution of the contract. Id.; Filippi v. Filippi,818 A.2d 608, 619 (R.I. 2003) (quoting Fram Corp. v. Davis,121 R.I. 583, 587, 401 A.2d 1269, 1272 (1979)).
Here, the Contract provides that in addition to the cash advance of $100,000, Drake will provide CFN with an additional $40,000 "to install improvements at the [Property], including but not limited to the installation of a new twin pole ID digital price sign, refac[ing the] canopy with Sunoco fascia and Horizon decals, re-decal[ing the] dispenser and install[ing] valances and paint[ing the Property] to Sunoco specifications." (Pl.'s Ex. 2 ¶ 25.) This provision is a clear and unambiguous expression of the parties' negotiations regarding the components of the re-imaging and their intent to limit the budget to $40,000. See Federal Deposit Ins. Corp. v.Singh, *Page 10 977 F.2d 18, 22 (1st Cir. 1992) (stating that "[a] contract is not ambiguous simply because litigants disagree about its proper interpretation"); Rey v. Lafferty,990 F.2d 1379, 1384 (1st Cir. 1993), cert. denied,510 U.S. 828, 114 S. Ct. 94, 126 L.Ed.2d 61 (1993) (noting that an agreement is considered ambiguous only where its terms are inconsistent on their face or the language is reasonably prone to different interpretations).
Further, a writing is fully integrated when it is adopted as the "final and complete expression of the agreement." Fram Corp,121 R.I. at 587, 401 A.2d at 1272 (stating that once an agreement is fully integrated, other expressions, oral or written, that occurred prior to or concurrent with the integrated agreement are not viable terms of the agreement). Where, as here, an agreement contains a contractual merger clause, the provision is interpreted as indicating the parties' intent to treat the contract, as embodied, as final and exclusive, and to preclude parol evidence of prior oral agreements. Filippi, 818 A.2d at 619 (finding that where an agreement contained a merger clause, evidence of oral agreement offered to supplement or explain parties' agreement should be excluded). Thus, evidence of the parties' prior negotiations should not be admissible or considered by the Court.
Even assuming arguendo that the Contract did not constitute a complete and exclusive statement of the terms of the parties' agreement and that evidence of the parties' prior negotiations was admissible to clarify ambiguities within the Contract, the Court would still find the Defendant's testimony more credible and that the expenditures causing the Overruns were not included in the original $40,000 budget. Rodriques v. Santos,466 A.2d 306, 312 (R.I. 1983) (stating that the question of who is to be believed is one for the trier of fact).
In his testimony, Zabatta stated that his discussions regarding the light boxes to illuminate the canopy, the removal of the island and second planter, and the size of the ID sign *Page 11 
took place prior to his signing the Contract. (Tr. 78.) Zabatta testified that he would have had discussions regarding these allegedly anticipated Overruns prior to signing the Contract because once he signed the Contract he knew he would not be able to "ask for anything else." (Tr. 78.) To support Zabatta's testimony, Plaintiffs rely on several drafts and a final version of the Letter of Intent as evidence of the content of the parties' negotiations. (Pl.'s Exs. 1, 3, 5, 6.) In addition, Plaintiffs point to a handwritten notation by Plumer on the top of a Rhode Island Hydraulics proposal from December 2006 as an indication that Plumer knew of the request for a larger, costlier nine-foot ID sign. (Pl.'s Ex. 4.) The Court, however, finds this testimony unconvincing.
Conversely, Defendant, through Plumer's testimony, has proffered sufficient evidence to establish a credible timeline and explanation of the events that transpired. See Hood,478 A.2d at 184 (stating that as the trier of fact in a non-jury setting, the trial justice weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences). In his testimony, Plumer explained that the handwritten note on Plaintiffs' Exhibit 4 — stating that the document was a "2nd proposal once Anthony insisted on removing [the] 2nd planter and going with [the] 9' ID" — was not written before the parties executed the Contract as implied by Plaintiffs, but subsequently added to the proposal in the spring of 2007 to explain to the accountants what "ultimately happened" in the period after the Contract was finalized. (Tr. 33-34; Pl.'s Ex. 4.)
Moreover, Plumer's testimony regarding the timing of the events that transpired is further supported by Defendant's Exhibits F and I, which indicate that the specifications and pricing for the nine-foot sign were not pulled from the Sunoco website until after execution of the Contract. (Tr. 119, 113; Def.'s Exs. F I.) While Plaintiffs' Exhibit 4 indicates that a proposal for a nine-foot *Page 12 
sign was requested in December 2006, Plumer testified that he had budgeted for a seven-foot sign and only requested the additional bid in case a gas line located at the site impeded with the digging, footing, and placement of the previously quoted smaller sign. (Tr. 28-30, 34, 107; Pl.'s Ex. 4; Def.'s Exs. C E.)
Furthermore, Plumer testified that in January 2007, he contacted Krebs at Everbrite to request engineering drawings to include with the permit application for the signage. (Tr. 94-94, 110-114; Def.'s Ex. H G.) This request and Plumer's subsequent submission of the permit application for a seven-foot ID sign in the spring of 2007, provide additional support for Defendant's contention that discussions regarding the contested expenditures — such as a larger sign — did not occur until after execution of the Contract. Id. Accordingly, in light of the testimony and evidence set forth by the Defendant, the Court finds Defendant's testimony regarding the timing of Plaintiffs' requests for the Overruns more credible.
 2 The Amendment to Dealer Sales Contract
Finding that the Overruns were not incorporated as part of the re-imaging budget under the original Contract, the Court further finds that Defendant failed to properly execute a valid amendment incorporating the additional amounts spent on the Overruns into the Contract. Defendant asserts that under the Contract, in order to be binding, an amendment need only be in writing and signed by the Seller.[12]
(See Pl.'s Ex. 2 ¶ 15.) Thus, Defendant contends that the Amendment, in writing and signed by Drake, is a binding amendment to the Contract and properly incorporates the additional amount of the Overruns. (Def.'s Reply Mem. 2.) *Page 13 
As a transaction within the U.C.C., the Contract is subject to the U.C.C.'s Statute of Frauds because the total value of the Contract exceeds $500. The Statute of Frauds is preserved by the U.C.C. in § 6A-2-201, which provides as follows:
 "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some record sufficient to indicate that a contract for sale has been made between the parties and signed by the party against which enforcement is sought. . . ." G.L. 1956 § 6A-2-201.
Thus, to be enforceable under the Statute of Frauds, a contract must not only be in writing, but it must also be signed by the party against whom enforcement is sought.[13] G.L. 1956 § 6A-2-201;see also Siesta Sol, LLC v. Brooks Pharmacy, Inc.,617 F. Supp.2d 38, 44 (D.R.I. 2007) (stating that to satisfy the Statute of Frauds, a writing must be "signed by the party against whom enforcement is sought").
Similarly, if a contract as modified comes within the Statute of Frauds, an oral modification is precluded and the requirements of the Statute of Frauds must be satisfied. See 2ALawrence's Anderson on the Uniform CommercialCode, § 2-209:75 (3d ed. 2008). Specifically, § 6A-2-209 provides in part:
 "Modification, rescission, and waiver.
 ". . .
 "(2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party. *Page 14 
 "(3) The requirements of the statute of frauds section of this chapter (§ 6A-2-201) must be satisfied if the contract as modified is within its provisions. . . ." G.L. 1956 § 6A-2-209.
Where, as here, the Amendment, although in writing, is signed only by Drake, it fails to satisfy the signature requirement of § 2-201(1) and is therefore unenforceable against the Plaintiffs under § 2-209(3). G.L. 1956 § 6A-2-209(3); Siesta Sol, LLC,617 F. Supp.2d at 44; United California Bank v. EasternMountain Sports, Inc., 546 F. Supp. 945, 960 n. 3 (D. Mass. 1982) (noting that U.C.C. § 2-209 sets forth various requirements that an agreement modifying a contract must meet in order to be valid).
Furthermore, having stipulated in the Contract that "[n]o amendment, alteration, or modification or waiver of this Contract shall be binding unless in writing . . .," Plaintiffs are not bound by any subsequent oral modifications between the parties.See
G.L. 1956 § 6A-2-209 cmt. 3 (stating that "[s]ubsection(2) permits the parties in effect to make their own Statute of Frauds as regards to any future modification of the contract by giving effect to a clause in a signed agreement which expressly requires any modification to be by signed writing."); 2A Lawrence's Andersonon the Uniform Commercial Code, § 2-209:81 (3d ed. 2008) (stating that a provision requiring modification of the contract be by a signed writing, is binding on the parties to the agreement).
Accordingly, the Amendment, unilaterally executed by Drake in December 2007 is not binding. Without an enforceable amendment to the Contract, the additional amount of the Overruns has not been incorporated into the Contract, and the original terms of the Contract remain binding. *Page 15 
 3 The Contract Was Properly Terminated
Defendant alleges that Plaintiffs are in default of their obligations under the Contract, thus triggering its right to foreclose on the mortgages. (Def.'s Post Trial Mem. 6.) Plaintiffs contend they properly terminated the Contract in December 2008 by paying the amount owed under the Contract. (Pl.'s Post Trial Mem. 6.)
In the instant matter, the Pay-off Letter stated that Drake "would agree to mutually terminate [the Contract] at any point in the future that [CFN's] balance [was] paid in full." (Pl.'s Ex. 8.) It further indicated that the account balance as of April 30, 2008 was $136,522.33. Id. In his testimony, Plumer stated that this "balance" reflected the remaining amortization of the re-imaging loan and the Overruns for the re-imaging. (Tr. 125; Pl.'s Ex. 9.) Although the Pay-off Letter requested payment of the "account balance" in order to mutually terminate the Contract, the Notice sent to CFN on January 20, 2009, clarifies that the balance sought was the "balance remaining under the Contract." (Def.'s Ex. B.)
At the time Plumer drafted the Pay-off Letter, he was acting under the assumption that Plaintiffs' balance remaining under the Contract included the Overruns that had been incorporated by the Amendment. (Tr. 125.) The Amendment, however, is unenforceable, and the original terms of the Contract remain intact. Accordingly, the $21,761.53 sought by Drake in the Pay-off Letter and Notice is not a balance owed or remaining under the Contract.
While the Check tendered by CFN in December 2008 differed from the amount indicated in the Pay-off Letter, it represented the fully amortized balance due under the Contract. (Tr. 82-83, 91.) By tendering payment for the amortized balance of the $140,000 loan, the "balance *Page 16 
remaining under the Contract" was fully paid and the Contract was terminated in accordance with the Notice and Pay-off Letter.
Drake contends it is entitled to the lost profits resulting from Plaintiffs' failure to purchase the minimum amount of fuel specified in the Contract. (Def.'s Reply Mem. 2-3.) However, as the parties mutually terminated the Contract in December 2008, the Court finds that Plaintiffs did not breach the Contract and are not in default. As the parties' contractual rights and obligations have been fully satisfied, the Court finds Defendant has suffered no injury and denies Defendant's request for lost profits. See Rhode IslandManaged Eye Care, Inc. v. Blue Cross Blue Shield of R.I.,996 A.2d 684, 694 (R.I. 2010) (quoting George v. George F.Berkander, Inc., 92 R.I. 426, 430, 169 A.2d 370, 372 (1961)) (stating that lost profits serve to put the injured party as close as is reasonably possible to the position he would have been in had the contract not been breached).
 B The Mortgages
Having found that CFN satisfied its obligations under the Contract by complying with the Pay-Off Letter, for purposes of discussion, the Court will address the parties' arguments regarding the validity of the mortgages in securing present and future loans. Plaintiffs contend that the mortgages are not valid security for Drake's additional re-imaging expenditures because they are not in compliance with G.L. 1956 § 34-25-1, et seq. (Statute). Defendant counters that both mortgages contain covenants securing present and future loans and that the Statute is not applicable to the facts at hand.
The Statute, entitled "Future Loans and After-Acquired Property," provides a mechanism by which a real estate mortgage secures priority for both present and future advances. People's *Page 17 Sav. Bank v. Champlin Lumber Co.,106 R.I. 225, 229, 258 A.2d 82, 85 (1969). The Statute provides, in pertinent part:
 "(a) Whenever a mortgage deed in statutory form or other form mortgaging real property is entitled at the beginning thereof "Mortgage to secure present and future loans under §§ 34-25-1 — 34-25-5" and contains in its provisions a provision to the effect that it is intended to secure present and future loans and states a maximum amount as the total of the principal amount of loans to be secured thereby, hereinafter referred to as the stated maximum amount, the mortgage deed shall be security from the time of its recording in the records for recording real estate mortgages in the city or town in which the real property mortgaged therein is located for all loans which at the time of or before the recordings are made or agreed to be made by the mortgagee to the mortgagor on the security of the mortgage and shall also constitute security from the time of its recording for all additional loans made from time to time by the mortgagee to the mortgagor on the security of the mortgage after the recording of the mortgage and prior to its discharge of record, whether or not made after reduction of the principal of any loan made on the security of the mortgage." G.L. 1956 § 34-25-1.
To qualify under the Statute, a mortgage securing present and future loans must state a maximum amount — the total of the principal amount of loans to be secured — and must contain the requisite language specified by the Statute.
While the Plaintiffs correctly assert that because the mortgages fail to specify a maximum amount, they fail to meet the requirements of the Statute, the Court notes that failure to abide by the Statute's requirements does not necessarily invalidate them.People's, 106 R.I. at 229, 258 A.2d at 85 (stating that G.L. 1956 § 34-25-1, et seq. is not the only mechanism by which to secure future loans under real estate mortgages). In fact, G.L. 1956 § 34-25-5 states in pertinent part:
 "§§ 34-25-1 to 34-25-6 . . . shall not apply to nor affect, directly, or indirectly, or by implication, any mortgage thereafter made, whether or not it provides for future loans, unless it contains the provisions required under § 34-25-1 and is also entitled at the *Page 18 
beginning thereof "Mortgage to secure present and future loans under §§ 34-25-1 to 34-25-5." G.L. 1956 § 34-25-5.
The plain language of the Statute does not invalidate mortgages that do not abide by its terms, but simply states that the protections afforded by Statute are not implicated and are not applicable.
Furthermore, the legislative history supports the Court's determination that the Statute is not implicated. The Statute was passed by the Rhode Island legislature to deal with the issue of whether a future loan made pursuant to a previously recorded real estate mortgage was superior to a subsequent mortgage recorded prior to the time of the future advancement. People's,106 R.I. at 229, 258 A.2d at 85 (1969). Prior to the enactment of the Statute, Rhode Island courts determined the issue of priority based on whether the advancement was obligatory or voluntary.Id. The Statute resolves the issue by creating a definite mechanism by which to establish priority of future advances against intervening junior creditors. Id. Under the Statute, absolute priority is afforded to obligatory advances not in excess of the stated maximum amount, and a similar priority is extended to optional future advances, but only up to $3,000. Id.
Accordingly, the Court finds that the Statute and its protections are not applicable to the instant dispute.
 C Non-Contract Remedies 1 Recovery Under Unjust Enrichment or Quasi-Contract
Although not specifically pleaded by the Defendant, the Court finds that Drake has presented sufficient evidence to support a claim of unjust enrichment. The doctrine of unjust enrichment is an equitable remedy by which the courts permit recovery where "one person has received a benefit from another and the retention thereof would be unjust under some legal *Page 19 
principle recognized in equity." Rhode Island Hosp. TrustCo. v. Rhode Island Covering Co.,96 R.I. 178, 179-80, 190 A.2d 219, 220-21 (1963); Doe v.Burkland, (stating that unjust enrichment generally applied where one party retains a benefit from another without appropriate payment, and no contract between them exists). The obligation to pay in cases of unjust enrichment or quasi-contract "arises, not from consent of the parties, as in the case of contracts, express or implied in fact, but from the law of natural immutable justice and equity." Hurdis Realty, Inc. v. Town of N. Providence,121 R.I. 275, 278, 397 A.2d 896, 897 (1979).
Claims based upon theories of unjust enrichment and quasi-contract are essentially identical. R B Elec. Co. v. Amco Constr.Co., 471 A.2d 1351, 1355 (R.I. 1984). To recover under quasi-contract for unjust enrichment, Drake must establish that (1) a benefit was conferred upon CFN by Drake; (2) CFN appreciated the conferred benefit; and (3) CFN accepted the benefit under circumstances in which it would be inequitable for them to retain the benefit without paying Drake. Id. at 1355-56;Hurdis Realty, 121 R.I. at 278, 397 A.2d at 897. Of these three elements, "[t]he most significant . . . is that the enrichment to the defendant be unjust." Amco, 471 A.2d at 1356.
In the instant matter, Drake spent $21,761.53 over and above the amount contracted for by the parties in order to satisfy CFN's requests throughout the re-imaging process. Having spent this money improving the property, furnishing materials, and rendering services, Drake conferred a benefit on CFN. NarragansettElec. Co. v. Carbone, 898 A.2d 87, 99 (R.I. 2006) (stating that the first element of unjust enrichment is satisfied by a showing that improvements are made to property, materials are furnished, or services are rendered without payment).
Furthermore, because CFN received additional benefit and value in the form of a nine-foot ID sign, removal and re-pavement of curbing, installation of canopy illumination, and *Page 20 
painting of the Property — work not budgeted for as part of the re-imaging loan — the second element of unjust enrichment is satisfied. Id. at 100 (stating that the second element — appreciation of the benefit — is satisfied where the party profits from the benefit).
The final element of unjust enrichment is satisfied if a party "can prove the reasonable value of services rendered without payment." Id. at 100. Here, Drake spent an additional $21,761.53 complying with requests for which it has not been reimbursed. (Tr. 118; Def.'s Ex. J.) Drake spent these monies with the belief that they would be repaid as part of an "addendum" or amended contract. (Tr. 114-117.) Consequently, it would be unjust to now allow Plaintiffs to reap the benefit of the value conferred by Drake.[14]
Accordingly, Plaintiffs are ordered to pay Drake for the value of the unpaid Overruns — $21,761.53 — subject to the parties' proper amendment of the pleadings to conform to the evidence in accordance with Super. R. Civ. P. 15(b).[15] Fram Corp,121 R.I. at 591, 401 A.2d at 1274 (finding that where the opposing party failed to object to evidence of an unpleaded claim, the party is deemed to have impliedly consented to inclusion of the issue). *Page 21 
 2 Injunctive Relief
As part of their complaint, Plaintiffs seek injunctive relief to enjoin foreclosure of the Property. Defendant has requested that the Court deny Plaintiffs' request for injunctive relief and vacate the TRO currently preventing foreclosure.
As a result of this Court's determination that the Contract was mutually terminated and the parties' obligations satisfied when payment was tendered in December 2008, the Court finds that the mortgages securing the obligations of the Contract should be discharged and the security interests should be terminated. Accordingly, here, there is no need for injunctive relief.
 3 Attorneys Fees, Costs, and Expenses
It is well settled in Rhode Island that under the "American Rule," litigants are generally required to pay their own attorney's fees, absent statutory authority or contractual liability. Moore v.Ballard, 914 A.2d 487, 489 (R.I. 2007) (citing Eleazer v. TedReed Thermal, Inc., 576 A.2d 1217, 1221 (R.I. 1990). This rule, however, is not without exception. See Blue Cross Blue Shieldof R.I. v. Najarian, 911 A.2d 706, (R.I. 2006) (citingChambers v. NASCO, Inc.,501 U.S. 32, 45, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991) (stating three specific circumstances courts have granted an exception: (1) pursuant to the "common fund exception," a court may award attorney's fees to the party whose litigation efforts directly benefited others; (2) a court may also assess attorney's fees as a sanction for willful disobedience of a court order; and (3) a court may award attorney's fees when a party has acted in bad faith or for oppressive reasons); see also Vincent v.Musone, 574 A.2d 1234, 1235 (1990) (affirming the Court's inherent power to *Page 22 
fashion appropriate remedies that "serve the ends of justice"). These exceptions are not applicable in the instant matter.
Furthermore, there is no contractual liability to support an award of attorney's fees. The Court has already determined that CFN's tender of the balance remaining under the Contract terminated the Contract and the parties' rights and obligation therein. As a result, the Court finds that Plaintiffs are not in default of the Contract, and Defendant is not entitled to the "costs, expenses (including attorney's fees) and damages" provided for in the Contract in the event of a default. (Pl.'s Ex. 2 ¶ 26(b)(ii).)
Similarly, the parties' requests for attorney's fees and costs fail under a theory of statutory liability. The parties' have not invoked any statutory authority to support their claims for attorney's fees and costs, and the Court finds no statutory basis upon which to grant such relief. Accordingly, the Court finds that each party must bear its own attorney's fees, costs, and expenses.
 VI Conclusion
After due consideration of all the evidence, together with the arguments advanced by counsel at trial and in their memoranda, the Court finds that Plaintiffs have satisfied all their obligations under the Contract. By tendering a check reflecting the remaining balance due under the Contract, Plaintiffs terminated the Contract pursuant to Plumer's Pay-off Letter. As a result, the Court holds that Plaintiffs are not in default of the Contract, the mortgages securing the $140,000 loan and Contract obligations should be discharged, and the security interest should be terminated. Additionally, the Court finds that Defendant has established a claim for unjust enrichment and orders Plaintiffs to pay Drake $21,761.53, subject to the parties' proper *Page 23 
amendment of the pleadings to conform to the evidence. In light of its determinations, Plaintiffs' request for injunctive relief is denied, and the TRO is vacated. Having determined that the parties have no contractual or statutory liability upon which to ground their claims, the Court finds that each party must bear its own attorney's fees, costs, and expenses.
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record.
[1] A Temporary Restraining Order (TRO) was issued by the Court following a hearing on October 1, 2009. The TRO enjoined Defendant from foreclosing the mortgage on the subject premises, pending a hearing on Plaintiffs' request for a Preliminary Injunction. The Preliminary Injunction hearing was scheduled for October 29, 2009, but was continued and consolidated with a trial on the merits held on January 1, 2010. (Tr. at 1.)
[2] Re-imaging refers to the process by which a gas station's appearance is renovated in accordance with corporate standards dictated by the name brand refiner from which the station purchases its gasoline. (Tr. 16.) The re-imaging process typically involves work on the canopy over the fueling island, the dispensers, paint colors for the building, and signage used by the gas station.Id. This work is usually completed by Drake's vendors and under Drake's supervision and direction. (Tr. 17.)
[3] The Zabattas signed the Guaranty which obligated them to "unconditionally guaranty payment when due of any and all present and future indebtedness owed by [CFN] to [Drake]. . ." and to assign the Property as collateral. (Pl.'s Ex. 2.)
[4] Pursuant to the Contract, CFN would purchase gasoline from Drake at a posted rack price plus $0.0250 per gallon, applicable taxes, and transportation costs. (Tr. 41-42). The posted rack price is the standard price paid in the United Sates by purchasers of Sunoco gasoline as listed by the Oil Price Information Service. (Tr. 42.)
[5] The Contract also included a merger clause that provided:
 "15. Entirety of Contract: No prior stipulation, agreement or understanding of the parties or their agents shall be valid or enforceable unless embodied in this Contract or covered by these provisions or by a writing duly executed. No amendment, alteration, or modification or waiver of this Contract shall be binding unless in writing and signed by [Drake]. [Drake's] right to require strict performance of this Contract shall not be affected by any previous waiver or course of dealing. If two or more persons are named as DEALER the obligations hereof shall be joint and several." (Pl.'s Ex. 2 ¶ 15.)
[6] As provided by the Contract, the $140,000 loan consisted of the $100,000 signing bonus and the $40,000 budgeted for improvements to the gas station. (Pl.'s Ex. 2 ¶ 25.)
[7] Plumer claims he had previously approached Zabatta with an amendment in June 2007. (Tr. at 61.)
[8] A temporary allowance is a request to decrease the price at which the gas station purchased the gas from the supplier in order to lower the price paid by the station's customers. (Tr. at 80.)
[9] Plaintiffs' Exhibit 7 is an amortization document prepared by Drake tracking the sale of gasoline to CFN and the amortized balance remaining on the original loan. (Tr. 58; Pl.'s Ex. 7.) In accordance with the Contract, CFN's payment reflected the $140,000 loan reduced by adding $0.0311 times the total number gallons of gasoline actually purchased by CFN, subject to several credits totaling $777.62. (Tr. 82-83; Pl.'s Ex. 9.) The balance due under the contract varied based on the sale of gasoline from Drake to CFN. (Tr. 63-64.)
[10] The Contract states in pertinent part that "[n]o prior stipulation, agreement or understanding of the parties or their agents shall be valid or enforceable unless embodied in this Contract or covered by these provisions or by a writing duly executed." (Pl. Ex. 2 ¶ 15.)
[11] This transaction is governed by the U.C.C. because the Contract is for the sale of goods. G.L. 1956 § 6A-2-102. Under the U.C.C., a contract to supply fuel — such as the Dealer Sales Contract — constitutes a contract for the sale of goods. G.L. 1956 § 6A-2-107; see also Etheridge OilCo. v. Panciera, 818 F. Supp. 480, 483 (D.R.I. 1993) (stating that under North Carolina's version of the U.C.C. — adopted in essentially the same form as Rhode Island's — a contract to supply fuel constitutes a contract for the sale of goods); 57 Am. Jur. 2d Sales § 55.
[12] In pertinent part, the Contract provides that "[n]o amendment, alteration, or modification or waiver of this Contract shall be binding unless in writing and signed by Seller." (Pl. Ex. 2 ¶ 15.)
[13] The Court acknowledges that the parties could have circumvented the Statute of Frauds through a mutually agreed upon provision in the Contract. However, the Court is not presented with such a provision, and therefore proceeds in reviewing the Contract and Amendment under the requirements of the Statute of Frauds and U.C.C.
[14] Drake may not recover the additional $21,761.53 under the Zabattas' Guaranty. (See Pl.'s Ex. 2.) While the Zabattas agreed to "unconditionally guaranty payment when due of any and all present and future indebtedness owed by [CFN] to [Drake] . . . under the terms of the [Contract]," because the Court finds that CFN properly terminated the Contract and satisfied the parties' obligations, the $21,761.53 is not an indebtedness owed under the terms of the Contract. Similarly, Drake has no recourse under the Security Agreement. (See Pl.'s Ex. 12.) Where, as here, CFN has paid off the balance of the $140,000 loan, properly terminated the Contract, and satisfied its obligations under the Contract, the terms of the Security Agreement are not implicated.
[15] Rule 15(b) provides in relevant part:
 "(b) Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues." Super. R. Civ. P. 15(b).